# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3437

_____

Osman Farah Hagi-Salad,      *

         *

     Petitioner,      *

         *    Petition for Review of an

     v.      *    Order of the Board of

         *    Immigration Appeals.

John Ashcroft,      *

         *

     Respondent.      *

_____

Submitted: October 23, 2003

Filed: March 9, 2004

_____

Before LOKEN, Chief Judge, LAY and BOWMAN, Circuit Judges.

_____

LOKEN, Chief Judge.

Osman Hagi-Salad is a twenty-six year old citizen of strife-torn Somalia. He entered the United States without inspection in 1994 and applied for asylum in March 1995. Following a hearing, the immigration judge (IJ) denied the application, granting Hagi-Salad voluntary departure, and the Board of Immigration Appeals (BIA) dismissed his administrative appeal, with an opinion. Hagi-Salad petitions for judicial review. We conclude that the BIA erred by failing to apply 8 C.F.R. § 208.13(b)(3), a recently promulgated regulation defining when the ability to

relocate within an applicant's country of origin causes him to be ineligible for asylum. Accordingly, we remand to the BIA for further administrative proceedings.[1]

The Attorney General has discretion to grant asylum to a "refugee." 8 U.S.C. § 1158(b)(1). A refugee is defined as an alien who is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "Persecution is the infliction or threat of death, torture, or injury to one's person or freedom" on account of one of the five statutory grounds. Regalado-Garcia v. I.N.S., 305 F.3d 784, 787 (8th Cir. 2002).

An alien who establishes past persecution may be eligible for asylum on that ground alone; at a minimum, he is entitled to a presumption that he has a well-founded fear of future persecution if removed to his country of origin. See 8 C.F.R. § 208.13(b)(1); Fisher v. I.N.S., 291 F.3d 491, 497 (8th Cir. 2002). Under the current regulations, the INS may rebut this presumption by proving either "a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution," or that "[t]he applicant could avoid future persecution by relocating to another part of [his] country of nationality . . . and under all the circumstances, it would be reasonable to expect [him] to do so." § 208.13(b)(1)(i)(A) & (B). If the INS satisfies its burden of proof on either of these issues, the applicant is not eligible for a discretionary grant of asylum. § 208.13(b)(1)(i) & (ii).

---

[1]Hagi-Salad also appeals the denial of withholding of deportation, now called withholding of removal. See 8 U.S.C. § 1253(h) (1994) (current version at 8 U.S.C. § 1231(b)(3)). The standard for this distinct statutory relief is similar to but "more rigorous than that of well-founded fear required for a grant of asylum." Regalado-Garcia, 305 F.3d at 788. Given our disposition of the asylum appeal, we remand the denial of withholding of removal without additional discussion.

Though the people of Somalia consist of one major ethnic group who speak a common language and practice the Sunni Islam religion, the administrative record establishes that Somalis have segmented themselves into patrilineal clans that dominate political and social life. A December 1996 State Department report entitled, "Somalia: Profile of Asylum Claims and Country Conditions," stated:

> Clans are the key social group for virtually all Somalis. Reflecting the widespread inter-clan and sub-clan strife in the country, most asylum claims from Somalis are based on fears of retaliation of some kind from members of other clans or sub-clans -- based primarily on the applicant's own clan or sub-clan membership.

In considering asylum applications under 8 U.S.C. § 1158, the BIA has acknowledged that a Somali clan or sub-clan may be "a particular social group" for purposes of determining whether persecution or fear of persecution is "on account of" that protected ground. In re H-, 21 I. & N. Dec. 337, 342-43 (BIA 1996).

Hagi-Salad claims that he is entitled to asylum because he has suffered past persecution and has a well-founded fear of future persecution on account of his membership in the Darood clan.[2] Hagi-Salad's father is a member of the Majerteynia sub-clan of the large Darood clan. The Majerteynia sub-clan is prevalent in the northeast part of Somalia. But Hagi-Salad and his immediate family lived further south, in the capital city of Mogadishu, located in a region dominated by the Hawiye clan. In the 1970's, Hagi-Salad's father was a colonel in the Somali air force. The country was then run by a dictator, Mohammed Siad Barre, a member of the Marehan sub-clan of the Darood clan. In 1977, Hagi-Salad's uncle and other Majerteynia sub-clansmen formed the Somalia Salvation Democratic Front (SSDF) and mounted an

---

[2]The names of many Somali clans and sub-clans are inconsistently spelled in various parts of the voluminous administrative record. This opinion will use the spellings found in the hearing transcript.

unsuccessful coup against the Siad Barre government. As a result, Hagi-Salad's uncle was executed and his father was imprisoned for nine years. When released from prison, Hagi-Salad's father did not rejoin the military, and he has now lived outside Somalia for many years.

On January 28, 1991, one day after Siad Barre was driven from Mogadishu by a successful rebellion, members of the United Somali Congress, a Hawiye-dominated militia, entered Hagi-Salad's home, raped his mother and sister, and killed his maternal uncle[3] and paternal grandfather when they tried to protect the women. Hagi-Salad, then thirteen years old, hid from the intruders. Before escaping through a bathroom window, he heard the attackers say repeatedly, "you are not belonging to this country, you must leave here." Hagi-Salad testified that he recognized the militia leader as a member of the Hawiye clan and a former military colleague of his father who knew that the Hagi-Salad family were members of the Darood clan.

After escaping, Hagi-Salad fled Mogadishu and traveled to Kenya through areas of Somalia controlled by Hawiye militia, avoiding harm by claiming to belong to the Hawiye clan. He stayed in a Kenyan refugee camp for over three years while the other members of his immediate family took refuge in Yemen. Hagi-Salad left Kenya and stayed in Ethiopia for a year, hoping to reunite with his family. But war broke out in Yemen, preventing him from entering that country. An Ethiopian helped him travel to the United States, where he settled and resumed his schooling in a large Somali community in Rochester, Minnesota.

The Department of State Country Reports and other documents in the record agree that Somalia has not had a functioning central government since January 1991. After the collapse of Siad Barre's regime, Mogadishu descended into chaos and

---

[3]Hagi-Salad testified that his mother belonged to the less powerful Rahanweyn clan, prevalent in regions west of Mogadishu.

-4-

anarchy, with rival Hawiye warlords competing for power, terrorizing the civilian population, and eventually driving out United States and United Nations peacekeepers. However, conditions in other parts of the country have improved under local clan-based political authorities. In the northwest, an area that was formerly British Somaliland, members of the large Issak clan formed the Somali National Movement and declared a separate Republic of Somaliland, which the international community has not recognized as a state. The northeast is controlled by the Majerteynia-dominated SSDF. Other Darood sub-clans are strong in some southwest regions. This evidence suggests that the ability-to-relocate issue is important to Somali asylum claims.

A statement attached to Hagi-Salad's initial asylum application focused on his fear of returning to Mogadishu: "If I go back I will be killed by those people who seized our houses . . . so that I could not lay claim to my families [sic] properties . . . . [T]o this day there is no body [sic] from my clan living in Mogadishu for the same reason." In a later affidavit, he addressed the relocation issue:

> If I even were able to get to the area where more Daroods live in the Northeast, I would . . . still not be safe. This is because in Somalia people rely very heavily on their immediate family for protection and welfare. If the Daroods I were living with were fighting with other clans, I would be one of the first to be exposed to danger even though I have no experience with guns or fighting. This is because I have no family members who could ask for me to be spared.

At the evidentiary hearing, Hagi-Salad further addressed the relocation issue, testifying there is nowhere in the country he could safely live:

> On my mother's side, the area they live, they are not the whole people there . . . and [it is] now controlled by the Hawiye clan . . . . As I told you before, my father used to work [for] Siad Barre and [in] that area where my father's clan is they are still hostile [to] anybody who

worked for Siad Barre and if I go over there, they still know[] the name and they know my father . . . .

Three other witnesses testified that the areas controlled by the Darood clan are unstable, that Hagi-Salad has never lived in those areas and has no immediate family or other source of protection there, and that he faces great personal risk if he returns to Somalia due to his family's past political affiliations. Based upon this testimony and documentary evidence of the chaotic conditions in Somalia since January 1991, Hagi-Salad argued that he proved past persecution with evidence that members of his immediate family were raped and murdered, in his presence, by members of the rival Hawiye clan under circumstances establishing that the marauders acted on account of the Hagi-Salad family's membership in the Darood clan.[4]

Neither the IJ nor the BIA resolved the past persecution issue. The IJ found Hagi-Salad's testimony credible and the city of Mogadishu an area of continuing "significant conflict." However, relying on the State Department Profile of Asylum Claims and Country Conditions, the IJ also found that "the Darood clan is one of the main clans in Somalia," it controls "significant portions of the country" and "makes up 20% of the population," and "a person belonging to one clan might well be in serious danger if found in the territory of a rival clan, but face no problem what[so]ever if in an area controlled by his own fellow clansmen." The IJ found Hagi-Salad ineligible for asylum because "there has been an improvement in the conditions of the country as a whole, and in particular, [in] that area of Somalia which is under the control of the [politically active] Darood clan," so that Hagi-Salad has "a place in Somalia to which he could go and live in relative safety and where he

---

[4]"Acts of violence against an alien's family members may demonstrate a well-founded fear of persecution . . . [but] do not necessarily establish a well-founded fear of persecution absent a pattern of persecution tied to the petitioner[]." Nyonzele v. I.N.S., 83 F.3d 975, 983 (8th Cir. 1996) (quotations omitted).

would not be subject to persecution on account of his membership in the Darood clan."

The BIA dismissed Hagi-Salad's appeal, noting that the IJ "allowed for the possibility that the harm [Hagi-Salad] experienced in Somalia constituted past persecution," and tying the IJ's analysis more closely to the applicable regulations:

> Although a finding of past persecution gives rise to a presumed well-founded fear of future persecution, this does not automatically require a grant of asylum, as the Immigration Judge recognized (I.J. at 6). *See* 8 C.F.R. § 208.13(b)(1) (2002). Indeed, this presumption may be rebutted. *See* 8 C.F.R. § 208.13(b)(1)(i) (2002). We hold that the Immigration Judge correctly found that [Hagi-Salad] could relocate within Somalia <u>and not reasonably fear harm on account of a protected ground, to wit, clan membership</u> (I.J. at 6). (Emphasis added.)

Our problem with the above analysis is that the emphasized portion is contrary to the plain meaning of 8 C.F.R. § 208.13(b)(3), the subsection which explains how to determine whether it would be "reasonable" to expect the asylum applicant to relocate for purposes of 8 C.F.R.§ 208.13(b)(1)(i)(B):

> (3) *Reasonableness of internal relocation.* For purposes of determinations under paragraph[] (b)(1)(i) . . . of this section, adjudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. Those factors . . . are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

*   *   *   *   *

(ii) In cases in which . . . the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable, unless the Service establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate.

In other words, under § 208.13(b)(3), the internal relocation issue does not turn on the finding by the IJ and the BIA that Hagi-Salad does not reasonably fear country-wide clan-based persecution. Rather, the inquiry turns on whether relocation would be reasonable under a potentially broad range of relevant factors, including whether Hagi-Salad would face "other serious harm"[5] in areas of Somalia where the Darood clan or his Majerteynia sub-clan are dominant. In a close case, the question of past persecution avoided by the IJ and the BIA may well be critical, because it determines whether the INS or the asylum applicant has the burden of proof on the internal relocation issue. Compare 8 C.F.R. §§ 208.13(a) & (b)(2)(ii), with § 208.13(b)(1)(ii); Melecio-Saquil v. Ashcroft, 337 F.3d 983, 987-88 (8th Cir. 2003).

Before concluding that the BIA erred by not applying 8 C.F.R. § 208.13(b)(3), we considered whether the regulation applies even though it was promulgated after Hagi-Salad's removal proceedings commenced. In amending the asylum statute in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress

---

[5]In proposing 8 C.F.R. § 208.13(b), the INS explained:

By "other serious harm," we mean harm that may not be inflicted on account of race, religion, nationality, membership in a particular social group, or political opinion, but such harm would have to be so "serious" as to equal the severity of persecution. We would not expect, for example, that mere economic disadvantage or the inability to practice one's chosen profession would qualify as "other serious harm."

63 Fed. Reg. 31945, 31947 (June 11, 1998).

expressly provided that the prior version of 8 U.S.C. § 1158 governs this appeal because Hagi-Salad applied for asylum prior to April 1, 1997. See Pub. L. No. 104-208, § 604(c), 110 Stat. 3009-694 (Sept. 30, 1996); Fisher, 291 F.3d at 496. But the regulations in 8 C.F.R. Part 208, which were amended after the effective date of IIRIRA, expressly apply "to all applications for asylum under section 208 of the [Immigration and Nationality] Act." 8 C.F.R. § 208.1 (1998). Moreover, the BIA in this case applied other subsections of 8 C.F.R. § 208.13(b) that were adopted in December 2000 along with § 208.13(b)(3). See 65 Fed. Reg. 76121, 76133-34 (Dec. 6, 2000). Therefore, we conclude that Hagi-Salad is entitled to have his asylum application considered under the § 208.13(b)(3) reasonableness standards. Accord Lukwago v. Ashcroft, 329 F.3d 157, 181 (3d Cir. 2003); Melkonian v. Ashcroft, 320 F.3d 1061, 1070-71 (9th Cir. 2003).

To conclude, as a reviewing court, we are obliged to give deference to the BIA's construction of ambiguous provisions of the immigration laws. See I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999). We likewise defer to the agency's reasonable interpretation of governing Department of Justice regulations. But here, the BIA did not interpret 8 C.F.R. § 208.13(b)(3); its opinion altogether overlooked or disregarded this new regulation. That was an error of law which precludes us from affirming the agency's decision. Cf. Manzoor v. U.S. Dep't of Justice, 254 F.3d 342, 348 (1st Cir. 2001). In these circumstances, our proper disposition is to remand. See I.N.S. v. Ventura, 537 U.S. 12, 16 (2002).

_____