# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-4076

_____

Hugo Ivan Bellido;                      *
Miriam Puna-Villaneuvam,                *
                                        *
              Petitioners,              *
                                        *  Petition for Review of an Order
        v.                              *  of the Board of Immigration
                                        *  Appeals.
John Ashcroft, Attorney General         *
of the United States,                   *
                                        *
              Respondent.               *

_____

Submitted:  February 12, 2004

Filed:  April 22, 2004

_____

Before BYE, HEANEY, and SMITH, Circuit Judges.

_____

HEANEY, Circuit Judge.


        Hugo Ivan Bellido and his wife, Miriam Puna-Villanueva, appeal the decision of the Board of Immigration Appeals (BIA) denying their asylum applications.[1] Bellido maintains that he cannot return to Bolivia, his country of origin, because of the threat of persecution he faces by the Bolivian government due to his prior

_____

[1]Puna-Villanueva's asylum application is based on her husband's application.

leadership role in a railroad union. He also argues that the BIA improperly failed to consider his claim for relief under the Convention Against Torture. We find that the BIA erred by not granting Bellido's asylum application, and decline to consider whether the BIA also erred by not evaluating his Convention Against Torture claim.

## BACKGROUND

### I. Factual Background

In Oruro, Bolivia, after Bellido graduated from high school in 1981, he went to work for the Bolivian railroad. He started out as a messenger, eventually reaching a position in which he was responsible for investigating railroad accidents. After several years of being what he describes as a "passive" member of the Railroad Federation Union (RFU), he became part of the union leadership as the Secretary of Conflicts in 1985. Different parties operate within the RFU and Bellido's rise to his leadership position was precipitated by the internal election of his party to the union leadership. The RFU represented between 3,000 and 4,000 members, and Bellido's position made him one of the top twenty-five members of the union in the country. As the Secretary of Conflicts, he was responsible for resolving grievances between employees and between employees and the government.

In 1985 and 1986, Bellido participated in thirty to forty anti-government demonstrations. During a protest march in January of 1986, the army arrested Bellido. The army detained him for two weeks, along with five other union members. No charges were filed against him during his incarceration; nor was he afforded a chance to speak for his freedom to a judge or to military officials. Bellido also experienced physical abuse while in custody. When he was finally released, an army captain warned Bellido that if he was found participating in protests again, military members would kill him.

In August of 1986, Bellido participated in the March for Life, a protest involving 60,000 people in a 237 kilometer walk to La Paz. As the marchers neared La Paz, the government arrested union members, threatening to open fire on the crowd. Bellido was forced into hiding at a nearby railroad office for several days to avoid arrest. Following the march, the government forbade all union activities. Bellido, fearful of government retaliation, lived a transient lifestyle in Bolivia, infrequently returning to his hometown for over two years. Although people questioned his family as to his whereabouts, Bellido's family was not harmed during his absence.

## II. Procedural Background

Bellido used a tourist visa to gain entry to the United States from Bolivia on February 2, 1989. At that time he was married to Norma Velasco; he divorced Velasco in 1994 and she returned to Bolivia with their two children. Puna-Villanueva entered the United States on December 14, 1994, and overstayed her tourist visa. Bellido and Puna-Villanueva married, and they have two United States citizen children together: Jonathan, now 7 years old, and Melanie, now almost 6 years old. Bellido and Puna-Villaneuva concede that they are deportable.

After spending seven years and two years, respectively, in the United States, Bellido and Puna-Villanueva's removal proceedings commenced on April 5, 1996. They requested relief based upon suspension of deportation,[2] asylum, withholding of deportation, and voluntary departure. In support of his claims, Bellido presented evidence attesting to his status as an upright member of American society and to the situation he endured in Bolivia: testimony from Bellido's employer and pastor that detailed his rise to a management position at Service Master and his committed church involvement; the deed from the house he purchased in a Minneapolis suburb;

---

[2]Only Bellido was eligible to claim suspension of deportation relief.

documentation of Bellido's membership in Bolivia's railroad union; documentation describing labor unrest in Bolivia and the government's response to it; and Bellido's own testimony about his past experiences in Bolivia. The immigration judge (IJ) evaluated the evidence and ultimately denied Bellido's asylum application. The IJ's decision was premised on several observations: 1) the incredulity of Bellido's testimony; 2) the insufficiency of the corroborating evidence; 3) Bellido's long absence from Bolivia; and 4) his family's relatively harassment-free life in Bolivia since his departure.

The BIA found that Bellido had failed to establish past persecution or a well-founded fear of future persecution. Specifically, the BIA stated that the harm Bellido experienced was not significant enough to qualify as persecution, that his Bolivian family was not injured during his time in the United States, and that the government never took action against Bellido. The BIA did not mention the IJ's credibility findings as a rationale for its affirmance, but did adopt the IJ's decision in conjunction with its observations.

On appeal, Bellido argues that he presented substantial evidence upon which the BIA should have granted him asylum. He further argues that the IJ had a duty to evaluate a Convention Against Torture claim sua sponte, and that the BIA erred by not recognizing this.

## ANALYSIS

### A. Standard of Review

The Attorney General may grant asylum when the applicant qualifies as a "refugee." A "refugee" is defined as a person who is "unable or unwilling to return to . . . [his home] country because of persecution or a well-founded fear of persecution." 8 U.S.C. § 1101(a)(42)(A). The applicant's fear of persecution must

be subjectively genuine and objectively reasonable. <u>Melecio-Saquil v. Ashcroft</u>, 337 F.3d 983, 986 (8th Cir. 2003). If the applicant can establish past persecution, then he is entitled to a presumption of a well-founded fear of persecution. <u>Perinpanathan v. INS</u>, 310 F.3d 594, 598 (8th Cir. 2002). "Persecution" is not a defined term. Rather, it is a fluid concept that does not necessarily require the applicant to prove that his life or freedom has been or will be directly jeopardized. <u>See</u> <u>Bereza v. INS</u>, 115 F.3d 468, 472 (7th Cir. 1997).

We review the BIA's asylum determination to verify that it was based on substantial evidence, and reverse if "'the evidence was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution.'" <u>Perinpanathan</u>, 310 F.3d at 597 (quoting <u>Feleke v. INS</u>, 118 F.3d 594, 598 (8th Cir. 1997)). When an IJ makes credibility findings, we do not disturb the findings if they have a "'legitimate, articulable basis.'" <u>Nyirenda v. INS</u>, 279 F.3d 620, 624 (8th Cir. 2002) (citation omitted); <u>Perinpanathan</u>, 310 F.3d at 598 ("This court defers to an immigration judge's credibility finding where the finding is supported by a specific, cogent reason for disbelief." (citation and internal quotation marks omitted)).

## B. Substantial Evidence

We believe Bellido has amply proven his asylum claim. As is often the true in asylum cases, Bellido's own testimony provides the most complete account of the persecution he suffered at the hands of the Bolivian government. The IJ discounted his testimony citing to implausibilities that do not persuade us as being legitimate.

The IJ noted that Bellido did not detail his arrest or the death threat from the military on his asylum application. As a preliminary matter, we think it is important to note that a preparer aided Bellido in filling out his asylum application. Certain facts may have been omitted from the form itself because Bellido was unclear as to the level of detail he should provide due to language and cultural barriers. Perhaps

they were lost in translation or Bellido was unclear as to the level of detail he should provide. When the form asked directly whether he had been arrested, detained, or interrogated, Bellido answered in the affirmative. We fail to see why Bellido's omission of details should serve to undermine the entirety of his testimony. See Diallo v. INS, 232 F.3d 279, 288 (2d Cir. 2000) (stating that not all disparities should lead to an adverse credibility finding, especially when applicant's "testimony is generally consistent, rational, and believable"); Ceballos-Castillo v. INS, 904 F.2d 519, 520 (9th Cir. 1990) (distinguishing between inconsequential, incidental misstatements and inconsistencies that involve the core of the asylum claim). Instead, his testimony should be viewed in light of the entire evidentiary record. When done so, Bellido's version of his experiences in Bolivia are consistent and believable.

Bellido introduced into evidence his union card that states he was the Secretary of Conflicts. The card bears an official stamp and the General Secretary's signature; there has been no challenge to its authenticity. This evidence corroborates Bellido's union membership and his top position within the union. Further, Bellido submitted a letter from the Bolivian Workers' Trade Union dated October 15, 1996. In this letter, the leader of the Regional Workers' Union, Fernando Padilla, attests to Bellido's membership in the RFU and to his position as Secretary of Conflicts. Padilla also refers to Bellido's participation in the March for Life and the government's repression of that march.

Because Padilla did not mention Bellido's arrest in his letter, the IJ doubted Bellido was ever imprisoned by the army. The letter, however, does corroborate the crux of Bellido's testimony – he was a high ranking union official who was active in demonstrations against the Bolivian government. Bellido testified that he did not know Padilla personally. Since we doubt that the Bolivian government keeps records of its illegal arrests, Padilla would have no way of corroborating Bellido's arrest without first hand knowledge. It is often impossible for an asylum applicant to obtain

corroborating evidence from his home country.[3]  This impossibility should never serve to close the door on a grant of asylum.  See Melecio-Saquil, 337 F.3d at 987 (noting that an asylum applicant does not always have to corroborate his own testimony); Diallo, 232 F.3d at 287 (stating that even though corroboration may be a consideration in determining an applicant's credibility, it cannot be the only consideration because this would defy regulations and effectively require corroboration in all cases); see also 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.").[4]

The IJ and the BIA emphasized that Bellido's family has lived safely in Bolivia during the time he was in hiding and since his departure.  While his family was not persecuted in his absence,[5] Bellido testified that houses in his neighborhood were surrounded by the military shortly after the March for Life and that strangers have continually inquired as to his whereabouts.  Certainly the government was looking for Bellido.  He testified that three of his fellow union members were never heard from again after the March for Life.  The mysterious disappearance of Bellido's co-workers makes his fear of persecution both subjectively genuine and objectively reasonable.  Furthermore,  Bellido should not suffer simply because the Bolivian

---

[3]In fact, when asked why he didn't receive a letter from the RFU to corroborate his arrest, Bellido testified that he had tried to contact the union but it would not help him in the way that he needed.  (R. at 442.)

[4]Even though Bellido filed for asylum prior to the promulgation of 8 C.F.R. Part 8, we should still apply it to his case.  See Hagi-Salad v. Ashcroft, 2004 WL 421748, at *4 (8th Cir. Mar. 9, 2004) (applying 8 C.F.R. § 208.13 to an asylum application filed prior to the regulation's passage).

[5]Bellido amended his asylum application during his testimony in front of the IJ to correct his original statement that his family had been persecuted.  This further demonstrates that he did not fully comprehend the questions posed to him on the asylum application.

government has chosen to focus its efforts on persecuting only him, as opposed to his family. We find his fear that the government is still looking for him to be well-grounded in his past experiences.

The evidence presented relating to country conditions in Bolivia affirms Bellido's fear of returning. The newspaper articles he submitted to the IJ demonstrate that the Bolivian government was cracking down on union activities during the time period Bellido was in Bolivia, and this continues to be the case today. According to one article, the March for Life resulted in union leaders going into exile. Even prior to this time, another article submitted by Bellido discusses the observations of a Paraguayan labor leader who was concerned by the violence the Bolivian government perpetrated on Bolivian workers. The IJ dismissed much of the documentary evidence as focusing on labor unrest among cocoa farmers, but our review of the evidence indicates otherwise.

The 1995 State Department Report refers to labor unrest in response to the government's efforts at privatization. The government reacted by arresting hundreds of people and confining them to rural military bases. The same report continues to state that "nearly all civilian government workers are unionized," and that "[w]orkers are not penalized for union activities."[6] (R. at 108.) Juxtaposed against the government's response to union demonstrations, however, we are left to conclude that the only way for a unionized worker to avoid the government's oppressive forces is by not protesting. The fact that Bolivian workers can peacefully unionize is a meaningless observation and does not address the situation Bellido would face upon his return to Bolivia – the government's response to someone who was an active union *leader* in thirty to forty protests, not a passive union *member*. Bellido has

---

[6]This comment was also contained in the State Department's Advisory Opinion to the IJ. We note that an advisory opinion has questionable relevance in cases where the applicant has endured actual government persecution. See Singh v. Itchert, 69 F.3d 375, 380 (9th Cir. 1995).

already been a high ranking union organizer, he has already been arrested, and his life has already been threatened. Particularly because of his role as Secretary of Conflicts – the RFU leader who dealt directly with the government – we see no reason why his absence from Bolivia would eliminate the government's motivation to cause Bellido harm.[7] This is especially true given that information indicates labor unrest is still occurring in Bolivia.

By Bellido's own uncontradicted account, the military arrested him because of his participation in a protest against the government. This arrest was not accompanied by any formal charges. He was not afforded a chance to speak with a judge, attorney, or even his family. He was struck by a guard and ultimately threatened with his life. Bellido did not abdicate his leadership position in the union after he suffered this abuse. He participated in the March for Life, but when the government forcefully repressed the march, the possibility that the earlier death threat could be acted upon came to fruition. He lived on the lam, consistent with this fear of persecution. Nothing in the record causes us to doubt his testimony. The IJ therefore erred by discounting his credibility.

The BIA's decision was brief. It abruptly concluded that Bellido did not demonstrate his past experiences rose to the level of past persecution. After reviewing the record and examining the evidence as we have done above, we cannot agree with the BIA that an illegal arrest, accompanied by a death threat from a military member, and the government's subsequent active search for the individual, does not rise to the level of persecution an applicant must prove to be granted asylum.

---

[7]It is important to note that Bellido does not have to demonstrate there is a 100% chance, or even a 50% chance, of persecution upon his return to Bolivia. See INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987) ("One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place."); Montecino v. INS, 915 F.2d 518, 520 (9th Cir. 1990) (finding a 10% chance of future persecution sufficient to meet asylum requirements).

Accord Osorio v. INS, 18 F.3d 1017 (2d Cir. 1994) (finding a union leader eligible for asylum because he received death threats, members of his union were kidnapped and murdered, and he continued his union involvement after the government crackdown).

## CONCLUSION

The substantial evidence in this case supports the conclusion that Bellido and his wife have a well-founded fear of persecution and should therefore be granted asylum. We remand for proceedings consistent with this opinion.

SMITH, Circuit Judge, dissenting.

The record in this case contains substantial evidence supporting the Board's decision to deny asylum to the petitioner. We are obligated to affirm the BIA's conclusion that an alien is not eligible for asylum unless the alien shows that the record evidence not only supports reversal but compels it. *Navarijo-Barrios v. Ashcroft*, 322 F3d 561, 562 (8th Cir. 2003). Petitioner's evidence is considerably less than compelling. Even assuming that Bellido established past persecution based upon his detention in 1986 for union protest activities, the record does not show that the petitioner possessed a well-founded fear of future persecution. Regarding his possible return to Bolivia, Bellido stated:

> I really don't have any guarantees that I'm going to be able to - - in a freely way go to Bolivia and maybe find a job. I really don't know how it's going to affect me at this time. I really don't know, because I don't have any guarantees of what's going to happen . . . . I don't have anything in Bolivia . . . I don't have a house, I don't have a home, I don't have a job, I don't have furniture, I don't have anything.

-10-

It is apparent from this and other comments in Bellido's statement that he was principally concerned about his economic prospects. However, a fear of economic hardships does not establish a well-founded fear of persecution. *Nyonzele v. I.N.S.*, 83 F.3d 975, 983 (8th Cir. 1996) (citing *Minwalla v. INS*, 706 F.2d 831, 835 (8th Cir. 1983)).

I therefore respectfully dissent.

_____