# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2270

_____

| | | |
|---|---|---|
| Zahra A. Mohamed; Shukri Salah; | * | |
| Abdulkadir Salah; Hamida Salah; | * | |
| Abdi Salah, | * | |
| | * | |
| Petitioners, | * | |
| | * | Petition for Review of an Order |
| v. | * | of the Board of Immigration Appeals. |
| | * | |
| John Ashcroft, Attorney General | * | |
| of the United States of America, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: October 21, 2004
Filed: February 10, 2005

_____

Before LOKEN, Chief Judge, MAGILL, and BENTON, Circuit Judges.

_____

MAGILL, Circuit Judge.

Zahra Mohamed and four of her children,[1] natives of Somalia, petition for review of an order of the Board of Immigration Appeals ("BIA") affirming without

_____

[1]Mohamed initially listed five children, but only four children are parties to this appeal. Mohamed's second-oldest daughter, Idil Salah, is no longer a party because the Department of Homeland Security ("DHS") has granted her application for adjustment of status.

opinion the Immigration Judge's ("IJ") denial of their applications for asylum and withholding of removal. Mohamed argues that the IJ erred by: (1) concluding that Mohamed did not suffer past persecution on account of her Benadir clan membership; (2) finding her testimony regarding her husband's work for Siad Barre to be incredible; and (3) finding that she did not have a well-founded fear of future persecution on account of clan membership because she could relocate within Somalia. We have jurisdiction under 8 U.S.C. § 1252, and we deny the petition.

I.

After spending several years in a Kenyan refugee camp, Mohamed and her children entered the United States without inspection through Mexico on or about October 7, 1996. On June 23, 1997, Mohamed filed an affirmative asylum application with the asylum office in Chicago, listing five of her children as beneficiaries. An asylum officer conducted an interview with Mohamed and referred the petition to the immigration court. The Immigration and Naturalization Service ("INS")[2] initiated removal proceedings through a Notice to Appear, which charged that Mohamed was removable from the United States as an alien who entered without inspection. See 8 U.S.C. § 1182(a)(6)(A)(i). Mohamed conceded removability, but she contended that she was eligible for asylum and withholding of removal.

Ten days before the final removal hearing, Mohamed's youngest daughter, Shukri, filed a defensive asylum application on her own behalf, alleging her fear of undergoing female genital mutilation ("FGM") in Somalia. The IJ found that Shukri's asylum application was time barred, but he granted withholding of removal because he found it more likely than not that she would be forced to undergo FGM

_____

[2]On March 1, 2003, the functions of the former INS were transferred from the Department of Justice to three bureaus in the DHS. See Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).

in Somalia. Mohamed and her other children, however, cannot receive relief as derivatives of Shukri. See 8 C.F.R. § 208.21. Mohamed declined to designate a country of removal, so the IJ designated Somalia, the country of which Mohamed and her children are citizens, pursuant to 8 U.S.C. § 1231(b)(2)(D).

Siad Barre ruled Somalia as a dictator for twenty-one years. A December 1990 uprising was eventually successful in overthrowing his regime, and Siad Barre fled Mogadishu, the Somali capitol, in 1991. In her asylum application, Mohamed stated that in 1978, her husband became a full-time speech writer who would travel with Siad Barre. She stated that her husband "was on TV a lot and in the newspaper," and that "[h]e was with the president all of the time." R. at 360. At the removal hearing, she testified that her husband's job was "[n]ot [a] high position. [He] [j]ust used to work in the offices." R. at 112. When asked why her husband would have been on television, she stated, "I don't know, he just used to help him and as a correspondent and writing reports for him and something like that." R. at 113.

Mohamed alleged that on December 29, 1990, members of the United Somali Congress ("USC") entered her home in a Mogadishu neighborhood, looted it, and attacked her. In her asylum application, Mohamed explained that the USC was looking for her husband, Nur Salah. They asked, "[W]here is Nur Salah the blood sucker[?]." R. at 361. When they did not find her husband, "they took some goods like gold and clothing and cash." R. at 361. Mohamed stated that the USC left her house "to go to other areas where there was fighting going on" and that "[t]here was gun shooting going on all over near our area." R. at 361. At the removal hearing, Mohamed testified that the USC attacked anyone in the neighborhood who they thought had money or things they could take. R. at 119. After the USC attacked Mohamed and looted her home, they returned and killed her oldest son. Mohamed and her family fled Mogadishu for a refugee camp in Kenya where they lived until 1996. Mohamed then left Kenya with five of her children and entered the United States.

The IJ noted a lack of credible evidence that Mohamed was a member of the Benadir clan. However, he found clan membership to be sufficiently established in light of the difficulty of obtaining evidence from a country that was in a state of anarchy when she fled, and he found that the Benadir clan was a "particular social group" within the meaning of 8 U.S.C. § 1101(a)(42). Even so, the IJ found that, at best, Mohamed's house was attacked as part of the generalized looting and banditry that swept Mogadishu in early 1991 and not on account of her membership in the Benadir clan.

The IJ found Mohamed's testimony about her husband's position in the Siad Barre government to be incredible, and she provided no documentary evidence to compensate for the lack of credibility. Thus, the IJ found that Mohamed failed to prove she was persecuted on account of a political opinion imputed from her husband's employment.

The IJ also found that Mohamed failed to proffer any evidence that she would be persecuted on account of her clan membership in a nonhostile location within Somalia. Thus, she did not have a well-founded fear of future persecution on a country-wide basis.

II.

Where, as here, the BIA affirms the IJ's decision without opinion, we review the IJ's decision as the final agency action. Dominguez v. Ashcroft, 336 F.3d 678, 679 n.1 (8th Cir. 2003). We will affirm the IJ's findings regarding past persecution and fear of future persecution if they are supported by substantial evidence in the record. INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); Francois v. INS, 283 F.3d 926, 931 (8th Cir. 2002). Under this standard, an IJ's determination that an alien is not eligible for asylum must be upheld unless "the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite fear of

persecution." Elias-Zacarias, 502 U.S. at 483-84. We will defer to an IJ's credibility finding when it is supported by a specific, cogent reason for disbelief. Perinpanathan v. INS, 310 F.3d 594, 597 (8th Cir. 2002).

The Attorney General may grant asylum to an alien who is physically present in the United States if the alien meets the statutory definition of a refugee. 8 U.S.C. § 1158(a). A refugee is an individual who is unable or unwilling to return to his or her native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A).

To establish eligibility for asylum, the alien carries the burden of proving past persecution or a well-founded fear of future persecution. 8 C.F.R. § 208.13(a). An asylum applicant can establish a well-founded fear by showing that a reasonable person in his or her circumstances would fear persecution for one of the five specified grounds. See INS v. Cardoza-Fonseca, 480 U.S. 421, 430-31 (1987).

A.

Mohamed first argues that the IJ erred in finding she did not suffer past persecution on account of her Benadir clan membership. To be eligible for asylum, the harm suffered must be particularized to the individual rather than suffered by the entire population. See Sivaainkaran v. INS, 972 F.2d 161, 165 (7th Cir. 1992). Harm arising from general conditions such as anarchy, civil war, or mob violence will not ordinarily support a claim of persecution. See Velasquez v. Ashcroft, 342 F.3d 55, 58 (1st Cir. 2003); Ochave v. INS, 254 F.3d 859, 865 (9th Cir. 2001); Rostomian v. INS, 210 F.3d 1088, 1089 (9th Cir. 2000); M.A. v. INS, 899 F.2d 304, 314-15 (4th Cir. 1990) (en banc). Although an alien cannot be expected to provide direct proof of his persecutor's motive, "since the statute makes motive critical, he must provide *some* evidence of it, direct or circumstantial." Elias-Zacarias, 502 U.S. at 483.

-5-

Mohamed believes that she was unfairly required to prove that the USC had "some degree of intent" to harm her on account of a protected ground. See Matter of Rodriguez-Majano, 19 I. & N. Dec. 811, 815 (BIA 1988). Mohamed argues that the "some degree of intent" standard is more vigorous than the "at least in part" standard used by other courts. See Lukwago v. Ashcroft, 329 F.3d 157, 170 (3d Cir. 2003) ("A persecutor may have multiple motivations for his or her conduct, but the persecutor must be motivated, at least in part, by one of the enumerated grounds."); Girma v. INS, 283 F.3d 664, 667 (5th Cir. 2002); Borja v. INS, 175 F.3d 732, 736 (9th Cir. 1999).

Mohamed feels that the IJ's use of the language "some degree of intent" rather than "at least in part" requires her to prove that the persecutor's "primary purpose" was to persecute her on account of a protected ground. Contrary to Mohamed's argument, the IJ recognized that a persecutor can have mixed motives and that persecution can occur in the context of civil strife. R. at 56 (citing Matter of Villalta, 20 I. & N. Dec. 142 (BIA 1990)). We see no difference between the "some degree of intent" standard and the "at least in part" standard. Neither standard requires the alien to show her persecutor's primary motive, and both standards are consistent with the Supreme Court's requirement that an alien provide *some* evidence of motive, direct or circumstantial. Elias-Zacarias, 502 U.S. at 483.

Mohamed's only evidence that she was persecuted on account of her clan membership is her testimony that her attackers lived in her neighborhood and therefore were aware of her clan membership. R. at 119. The IJ found this testimony, without more, to be insufficient proof that her attackers were at all motivated by her clan membership. The IJ noted that the attacks took place during "the peak of a civil war that tore Mogadishu apart" and appeared to be part of "the generalized looting and banditry that swept through Mogadishu" in early 1991. R. at 56, 58. The Country Report, which states that banditry was endemic in Somalia after the revolt against Siad Barre, further supports the IJ's conclusion. R. at 221. Mohamed lived

in a neighborhood comprised of people from different clans, and her testimony shows that the USC attacked anyone in the neighborhood who they thought had money and valuables to take.

Although the BIA previously found a Somali alien to have been persecuted on account of clan membership in Matter of H-, 21 I. & N. Dec. 337 (BIA 1996), the IJ adequately distinguished that decision. The alien in Matter of H- was a member of the Marehan subclan (Siad Barre's subclan), and his father greatly benefitted from Marehan subclan membership. Id. at 340-46. In finding evidence of clan-based motivation, the BIA relied heavily on State Department reports that indicated the USC targeted "identifiable members of the Darood clan and the Marehan subclan." Id. at 344. These reports also noted that the USC attacked Darood neighborhoods in Mogadishu, resulting in the death or disappearance of hundreds of mostly Darood victims. Id. Mohamed is not a member of Siad Barre's subclan, and while we recognize that persecution can occur in the context of clan-based civil warfare, an asylum applicant must show some evidence of clan-based motivation, direct or circumstantial. Elias-Zacarias, 502 U.S. at 483.

The attack on Mohamed and her son's death are tragic, but the record provides substantial evidence for the IJ's finding that Mohamed was not persecuted on account of her Benadir clan membership. Because the evidence is not so compelling that a reasonable factfinder would have to conclude that Mohamed was targeted because of her clan membership, we defer to the IJ's finding.

B.

Mohamed's second argument is that the IJ erred in finding her testimony regarding her husband's work for Siad Barre to be incredible and that she therefore did not suffer past persecution on account of an imputed political opinion. The IJ stated a specific, cogent reason for not believing Mohamed's testimony that her

husband was Siad Barre's speech writer. In her asylum application, Mohamed stated that her husband was a speech writer for Siad Barre; at the removal proceedings, she testified that she did not know what job her husband held and that it was a low-level position. Mohamed also did not provide any corroborative evidence or a convincing explanation for the discrepancies in her testimony. See In re Y-B-, 21 I. & N. Dec. 1136, 1139 (BIA 1998) ("[T]he weaker an alien's testimony, the greater the need for corroborative evidence."). Mohamed, despite having lived with her husband in Kenya for several years before entering the United States, made no attempt to verify her husband's job. Testimony from other witnesses is also extremely vague and provides little information other than that Mohamed's husband worked "with education" and "for the government." R. at 156, 169. Mohamed testified that as a housewife, she was unsure of her husband's job, but the record indicates that Mohamed did, while completing her asylum application, claim to know what her husband did for employment. As the IJ noted, "[I]f the lead respondent's husband was truly Siad Barre's speech-writer, she would not forget it." R. at 58.

We recognize that when the USC looted Mohamed's house, they stated that they were looking for "Nur Salah the blood sucker." R. at 360. However, because Mohamed's testimony regarding her husband's work for Siad Barre is vague and inconsistent and she has provided no corroborative evidence of her husband's employment, a reasonable factfinder would not be compelled to conclude that the term "blood sucker" had anything to do with Mohamed's husband's political affiliations or those imputed to Mohamed herself. We again defer to the IJ's finding.

C.

Mohamed's third argument is that the IJ incorrectly found that she did not have a well-founded fear of future persecution on account of her clan membership because

-8-

she could safely relocate within Somalia.[3]  When an alien has failed to demonstrate past persecution, she may still be eligible for asylum if she can show a well-founded fear of future persecution on a country-wide basis.  See 8 C.F.R. § 208.13(b)(2)(ii).  She must both genuinely fear persecution and must provide credible, specific evidence that a reasonable person in her position would fear persecution if returned.  Francois, 283 F.3d at 930.  Because she has not established past persecution, Mohamed has the burden to prove that a fear of future persecution exists on a country-wide basis or that it would be unreasonable to expect her to relocate.  Compare 8 C.F.R. § 208.13(a) (alien has the burden to prove that she is a refugee), with id. § 208.13(b)(1)(ii) (if alien establishes past persecution, government has the burden to prove that the alien could avoid future persecution by relocating).

Mohamed did provide some evidence in the form of newspaper articles that as a member of the Benadir clan, she could not safely resettle in Somalia.  The IJ, however, was persuaded by the State Department's Profile of Asylum Claims, which states that "[d]espite . . . bandits, conditions in the countryside are more stable than they have been in past years.  Thousands of refugees have returned to the southern part of the country—presumably because they thought it safe to do so."  R. at 208.  The IJ also relied on the Country Report, which shows that the Somalian economy has been improving since 1997 as a result of relative peace in much of the country.  R. at 220.

---

[3]Mohamed also makes a reference to future persecution on account of an imputed political opinion in her statement of the issues.  We find that any fear of future persecution on account of an imputed political opinion from her husband's work for Siad Barre is not objectively reasonable.  The State Department's Profile of Asylum Claims states that only "close relatives of former President Barre" and "senior security or military officials of his regime would be at some risk . . . from those bent on revenge."  R. at 203.

The IJ did not ignore Mohamed's evidence regarding relocation. Instead, he found Mohamed's newspaper articles indicating that it would be difficult for Benadir clan members to relocate within Somalia to be self-serving and unreliable. Mohamed's evidence, in comparison with the State Department records, is not so compelling that a factfinder could only conclude that Mohamed could not safely relocate within Somalia. Because substantial evidence supports the IJ's conclusion that Mohamed could safely resettle in a nonhostile region of Somalia, we defer to the IJ's finding that she has not demonstrated a well-founded fear of future persecution based on Benadir clan membership.

Relocation must not only be possible, it must also be reasonable. 8 C.F.R. § 208.13(b)(2)(ii). Mohamed argues we should remand this case to the BIA for a reasonableness determination because the IJ did not assess all of the factors in 8 C.F.R. § 208.13(b)(3).[4] See Hagi-Salad v. Ashcroft, 359 F.3d 1044, 1045 (8th Cir. 2004). In Hagi-Salad, the IJ avoided the question of whether Hagi-Salad suffered past persecution in Somalia by finding that even if he did suffer past persecution, the government sufficiently rebutted the presumption that he would suffer future persecution because he could relocate within Somalia. However, the IJ did not evaluate whether it would be reasonable to expect Hagi-Salad to relocate based on the

---

[4]Section 208.13(b)(3) provides:

For the purposes of determinations under paragraphs (b)(1)(i), (b)(1)(ii), and (b)(2) of this section, adjudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. Those factors may, or may not, be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

factors in 8 C.F.R. § 208.13(b)(3).  This court remanded to the BIA for a reasonableness determination based on these factors.  Id. at 1048; see also 8 C.F.R. § 208.13(b)(2)(ii).

In Mohamed's case, the IJ did not evaluate all of the regulation's reasonableness factors when determining whether she could relocate within Somalia. However, unlike in Hagi-Salad, the IJ conclusively found that Mohamed did not suffer past persecution.  Therefore, Mohamed had the burden to prove that relocation would be unreasonable, see 8 C.F.R. § 208.13(a); Melecio-Saquil v. Ashcroft, 337 F.3d 983, 987-88 (8th Cir. 2003), and the IJ noted that Mohamed failed to proffer any evidence to that effect.  As such, we will not remand this case for a reasonableness determination under 8 C.F.R. § 208.13(b)(3).

### III.

Because we find the IJ's decision that Mohamed is ineligible for asylum to be supported by substantial evidence in the record, we also find that she fails to meet the more rigorous standard for withholding of removal.  INS v. Cardoza-Fonseca, 480 U.S. 421, 429 (1987); Al Tawm v. Ashcroft, 363 F.3d 740, 744 (8th Cir. 2004). Accordingly, we deny the petition.

_____