# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2567

_____

| | |
|---|---|
| Abubakar Aweis Sheikh, | * |
| | * |
| Petitioner, | * |
| | * Petition for Review of an |
| v. | * Order of the Board of |
| | * Immigration Appeals. |
| Alberto Gonzales,[1] Attorney General | * |
| of the United States, | * |
| | * |
| Respondent. | * |

_____

Submitted: June 24, 2005
Filed: November 2, 2005

_____

Before RILEY, BRIGHT, and JOHN R. GIBSON, Circuit Judges.

_____

RILEY, Circuit Judge.

Abubakar Aweis Sheikh (Sheikh), a native and citizen of Somalia, petitions for review of a final order of removal of the Board of Immigration Appeals (BIA) affirming, without opinion, the immigration judge's (IJ) decision denying Sheikh's application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). Sheikh contends the IJ (1) erred in finding Sheikh not

_____

[1]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Alberto Gonzales is substituted for his predecessor, John Ashcroft.

credible, (2) abused her discretion in denying Sheikh's application based on a single misdemeanor conviction, (3) erred in finding Sheikh did not suffer past persecution based on his clan membership, and (4) erred in failing to grant relief under the CAT. We deny Sheikh's petition.

## I. BACKGROUND

After entering the United States in May 1997, as a refugee, Sheikh received lawful permanent resident status in July 1998. In 1999, Sheikh was convicted in North Dakota of encouraging or contributing to the deprivation or delinquency of a minor, a misdemeanor. As a result of Sheikh's conviction, the former Immigration and Naturalization Service (INS) issued Sheikh a Notice to Appear, charging Sheikh as being removable from the United States for having been convicted of an aggravated felony.[2] The INS withdrew its aggravated felony charge and issued a new charge against Sheikh, alleging he was removable for having been convicted of a crime involving moral turpitude.[3] Sheikh then applied for asylum, withholding of removal, and relief under the CAT.

In his asylum application, Sheikh alleged he fears returning to Somalia because of his membership in the Brava/Daktire minority clan. According to his application for asylum, in March 1992, eight Somali militiamen armed with rifles broke down the door to Sheikh's family home and killed his father, sister, and brother-in-law. The militiamen forced Sheikh and his father at gunpoint to lie on the ground in the courtyard, and one man placed his boot on the back of Sheikh's neck. The men then

---

[2]Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (INA) allows for removal of an alien convicted after entry of an aggravated felony. 8 U.S.C. § 1227(a)(2)(A)(iii). The INA defines an aggravated felony as a crime of violence for which the term of imprisonment imposed is at least one year. 8 U.S.C. § 1101(a)(43)(F).

[3]Section 237(a)(2)(A)(i) of the INA allows for removal of an alien who has been convicted of a crime of moral turpitude. 8 U.S.C. § 1227(a)(2)(A)(i).

looted the house. When the men saw Sheikh's mother, they said, "Aren't you the woman with a shop in the market? Give us your money!" After Sheikh's mother gave money to the men, Sheikh heard his sister shouting followed by gunshots. As Sheikh's father ran toward the house, the men shot him in the back. The men "left saying nothing but '[d]on't move or we'll kill you!'" Sheikh then went inside the house and discovered his sister and brother-in-law had been killed. Sheikh believed the militiamen attacked his family because of their minority clan membership and because his mother was a business woman. Sheikh fears he will be killed if he returns to Somalia "because the . . . militiamen . . . believe that [he is] going to take revenge on them," and because he is Bravian.

The IJ held several hearings on Sheikh's asylum application, during which Sheikh testified he is the oldest of seven children, including a sister named Asha. Asha and her husband lived with Sheikh and his parents in Somalia. Sheikh testified about the incident described in his asylum application, when, at the outset of the civil war in 1992, eight or nine members of the United Somali Congress (USC) broke down the door to his family's home, "looking for money and gold and everything you got." Sheikh testified the armed men shot and killed Asha and her husband. The men also shot Sheikh's father when he tried to rescue Asha. Sheikh's father was taken to the hospital and died nearly a month later. Sheikh testified he believed members of the USC attacked his family because they knew the family "couldn't defend [them]selves," and because "they knew that [Sheikh's] mother was a business woman and [his] father owned an expensive boat."

Following the attack, Sheikh and his family stayed at a mosque for safety. A few days later, Sheikh's family fled to Yemen by boat, but Sheikh stayed in Somalia until after his father's death approximately one month later. After leaving Somalia, Sheikh stayed in several refugee camps in Kenya from 1992 to 1997, and then Sheikh came to the United States as a refugee. Sheikh testified he cannot return to Somalia

because he believes he would not be safe in any part of the country and the same men who killed his family members would find and kill him.

After arriving in the United States, Sheikh helped his mother and siblings, including a sister named Asha, enter the United States. Sheikh's mother, Addei Mohamed Sheikh-Bakar (Sheikh-Bakar), arrived in the United States in December 2000. In her refugee application, Sheikh-Bakar stated her sister, Faduma Mohammed Sheikh-Bakar, and her sister's husband were shot and killed during the 1992 attack on the family's home in Somalia. Sheikh-Bakar's refugee application did not mention the death of Asha and Asha's husband.

Sheikh-Bakar submitted an affidavit in support of her son's asylum application. In her affidavit, Sheikh-Bakar stated that "[i]n March 1992, USC militiamen killed my husband, daughter and son-in-law." Sheikh-Bakar's affidavit did not mention the death of her sister and her sister's husband.

Sheikh-Bakar also testified before the IJ in support of her son's application for asylum. Sheikh-Bakar attempted to explain how Sheikh had a sister named Asha who was killed during the attack on the family's home in Somalia, as well as a sister named Asha who came to the United States. Each bore the identical name: Asha Aweis Sheikh-Vana. Sheikh-Bakar testified her husband had fathered a child with another woman, and that child's name was Asha. Accordingly, Sheikh-Bakar testified Sheikh had two sisters named Asha, and it was Sheikh's half-sister who was killed in 1992. Sheikh-Bakar explained she did not mention the death of Asha and Asha's husband in her refugee application, because "[she] was forgetful and after the, right after the civil war, [she] got sick and . . . didn't feel well." When asked why Sheikh's refugee application did not mention his aunt and her husband being killed during the 1992 attack on the family's home in Somalia, Sheikh-Bakar replied, "[Sheikh] was very busy with his father but he was not aware at that time that [Sheikh-Bakar's] sister and her husband were also in the house."

-4-

The IJ denied Sheikh's asylum claim on three alternative grounds. First, the IJ found Sheikh and his mother were not credible. Second, the IJ denied Sheikh's application for asylum "as a matter of discretion because of [his] conviction," finding it significant Sheikh had sexual intercourse with a minor. Third, the IJ denied Sheikh's asylum claim on the merits.

The IJ also denied Sheikh's claim for withholding of removal, concluding Sheikh failed to meet the higher burden of proof required for such relief. Finally, the IJ denied Sheikh relief under the CAT, because Sheikh failed to prove it was more likely than not he would be tortured by the government if removed to Somalia. The BIA affirmed the IJ's decision without opinion. Thus, for purposes of our review, the IJ's decision constitutes the final agency determination. See Ismail v. Ashcroft, 396 F.3d 970, 974 (8th Cir. 2005).

## II.    DISCUSSION
### A.    Asylum and Withholding of Removal Claims

Section 208 of the INA gives the Attorney General discretion to grant asylum to an individual who is a "refugee." 8 U.S.C. § 1158(b)(1)(A). The INA defines a "refugee" as an alien who is unwilling or unable to return to his or her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). An alien petitioning for asylum bears the burden of proving past persecution or a well-founded fear of future persecution. 8 C.F.R. § 208.13(a). A well-founded fear is one that is "both subjectively genuine and objectively reasonable." Ghasemimehr v. INS, 7 F.3d 1389, 1390 (8th Cir. 1993) (per curiam).

We defer to an immigration judge's finding regarding a petitioner's credibility, if that finding is supported by specific, cogent reasons. Mohamed v. Ashcroft, 396 F.3d 999, 1003 (8th Cir. 2005). "It is well settled that an immigration judge is in the

best position to make credibility findings because he [or she] sees the witness as the testimony is given." Mayo v. Ashcroft, 317 F.3d 867, 871 (8th Cir. 2003) (citation omitted). "While minor inconsistencies and omissions will not support an adverse credibility determination, inconsistencies or omissions that relate to the basis of persecution are not minor but are at the heart of the asylum claim." Kondakova v. Ashcroft, 383 F.3d 792, 796 (8th Cir. 2004) (citation omitted).

Sheikh argues we should reverse the IJ's adverse credibility finding because the IJ "dwelled on minor inconsistencies between Sheikh's refugee application and his mother's refugee application," and "ignored Sheikh's explanations for the differences." We disagree. The IJ's adverse credibility finding was supported by multiple, material inconsistencies among Sheikh's refugee papers, his testimony, his asylum application, his mother's refugee application, and his mother's testimony.

The IJ set forth a number of discrepancies, which the BIA adopted. First, the IJ noted Sheikh's refugee "application doesn't mention the death of []his aunt and uncle, despite the claim that they died in [Sheikh]'s home" in 1992 at the hands of the militiamen. Additionally, the IJ observed that although Sheikh's application stated "his sister, Asha, and her husband were also killed[,] [h]is mother's application doesn't mention the death of Asha and Asha's husband." The IJ found it "implausible that both [Sheikh] and his mother didn't mention all the deaths that occurred in their home when the home was attacked and [Sheikh]'s father was shot."

The IJ also found inconsistencies between two sets of Sheikh's refugee papers, as well as inconsistencies between Sheikh's refugee application and his testimony: "Based on the[] two different versions of the same Refugee Case History Form . . . , this Court doesn't know what to believe about who was killed in the house. Furthermore, [Sheikh] has not adequately explained why he testified in Court that he is the oldest of 7 children when his refugee application indicates that he is the 4th of 7 children."

The IJ next questioned Sheikh's explanation with respect to his sister and half-sister, the "two Ashas." The IJ found this aspect of Sheikh's testimony incredible because he "never testified at his first hearing as having two sisters named Asha," and "did not reference two Ashas in his application." The IJ believed "this story was made up in order to try [to] explain why his sister Asha, who allegedly died in Somalia, later entered the United States with his mother as a refugee."

Finally, the IJ identified an inconsistency in the testimony regarding Sheikh's contact with his mother and other family members after they left Somalia. Sheikh "testified that he didn't know where his family members were until 1998. However, his mother testified that after she left for Yemen by boat, she had contact with [Sheikh] after 1 year. This would have been in 1993." Although the IJ considered this inconsistency "a lesser inconsistency if standing alone," the IJ concluded "[w]hen this inconsistency is taken into consideration with the other problems and credibility issues . . . , the Court finds this inconsistency to be significant."

Sheikh's asylum claim is predicated on his allegation members of the USC attacked his family home and killed members of his family, and that allegation clearly relates to "the heart of [his] asylum claim." Kondakova, 383 F.3d at 796 (citation omitted). Because the IJ made the adverse credibility findings based on specific, cogent reasons, and the core of Sheikh's persecution testimony was not credible, we conclude substantial evidence supports the IJ's ultimate determination Sheikh is not eligible for asylum or withholding of removal. Id. at 796-98.

Further, on the merits, the IJ concluded Sheikh "failed to establish that the harm his family suffered in Somalia was on account of a protected ground." The men who broke into Sheikh's home demanded money, gold, and Sheikh's father's boat. Such action was more likely motivated by the greed of thieves and murderers and was

not action based upon "persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

To the extent Sheikh challenges the IJ's finding as a basis for removal that Sheikh's conviction under North Dakota law for encouraging or contributing to the deprivation or delinquency of a minor involved moral turpitude, we conclude the IJ did not abuse her discretion. Sheikh's conviction, which involved having sexual intercourse with a minor, is a crime of moral turpitude. See Marciano v. INS, 450 F.2d 1022, 1024-25 (8th Cir. 1971) (holding statutory rape is a crime of moral turpitude within the meaning of deportation statute); see also Palmer v. INS, 4 F.3d 482, 484-85 (7th Cir. 1993) (holding a misdemeanor conviction for contributing to the sexual delinquency of a minor is a crime involving moral turpitude); Castle v. INS, 541 F.2d 1064, 1066 (4th Cir. 1976) (holding "a man's carnal knowledge of a fifteen year old girl, not his wife, is so basically offensive to American ethics and accepted moral standards as to constitute moral turpitude *per se*").

## B.    CAT Relief

Sheikh also sought relief under the CAT. An alien is eligible for relief under the CAT if he shows "it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Torture is defined narrowly as an extreme form of cruel and inhuman treatment intentionally inflicted by or with the acquiescence of a person acting in an official capacity. Id. § 208.18(a)(1) and (2). We review the BIA's denial of relief under the CAT to determine "whether the evidence was so compelling that a reasonable factfinder must have found the alien entitled to relief." Ngure v. Ashcroft, 367 F.3d 975, 992 (8th Cir. 2004).

Sheikh presented no evidence other than the testimony and documents discussed above to support his claim for relief under the CAT. Although the IJ's adverse credibility determination and adverse decisions on asylum and withholding of removal are not determinative of a CAT claim, Sheikh has not met his burden under the CAT of establishing it is more likely than not he would be tortured by the Somalian government, or people acting on the government's behalf, if he returned to Somalia. For the reasons Sheikh failed to carry his burden for asylum and withholding of removal, he likewise fails to carry his burden for relief under the CAT. See Alemu v. Gonzales, 403 F.3d 572, 576 (8th Cir. 2005).

## III.　CONCLUSION

Accordingly, we deny Sheikh's petition for judicial review.

_____