HEANEY, Circuit Judge,
dissenting.
Onsongo testified that her affiliation with an opposition political group resulted in her being twice arrested and held for several days in dire conditions in Kenya. Following one of these arrests, she was raped by two police officers, who then beat her until she was unconscious. Shortly after she was released from jail, she found her place of business burned down. The IJ found her testimony incredible. Having reviewed the entirety of the administrative record, I disagree; it is clear that the IJ was more focused on minor incongruities with regard to Onsongo’s political affiliation than whether Onsongo truly suffered the abuse she recounted.
Onsongo testified consistently that she was a member of a group that opposed the regime in power in Kenya. She testified consistently that her group worked to protect and preserve the human rights of those oppressed by the government. She testified consistently that she was the treasurer of this group, and that authorities knew she was a member. She testified that because of her membership, she was arrested two times and held in inhumane conditions. Following one of the arrests, she was raped by two policemen and beaten until she lost consciousness. Shortly after this, she fled the country.
The IJ, BIA, and majority ignore this evidence because of confusion surrounding the name of Onsongo’s political group. I agree that the Administrative Record does not stand as a model of clarity on this issue.[7] As the majority notes, there are questions surrounding the relationship between the Democratic Party (DP) and Human Rights Africa (HRA). That ought not be used as a basis to deny Onsongo’s application, however. First, she was clear that she was a member of one or both of these groups, and that both groups opposed Kenya’s governing regime. As early as her first asylum application, filed on October 1, 2002, Onsongo stated that she was an “active member” of HRA and her family “belonged to” DP. (Admin. Rec. at 496.) In later proceedings, she used these names interchangeably. She explained that HRA was a local organization, and they maintained an affiliation with the DP to increase their visibility and stature. (See Admin. Rec. at 186-87 (“Our party was the Human, African Human Rights Kenya. The Democratic Party was our head organization.”).) She showed a membership card for DP, and stated that HRA *857 did not offer cards because they would put the members in jeopardy of persecution. When questioned, she stated the full names of the administrative officers of HRA. The IJ expressed frustration that Onsongo did not provide more “objective” evidence corroborating her HRA membership, but her testimony indicated the organization was a local one, with roughly six hundred dollars in its coffers. Even so, Onsongo was able to procure a 1998 master list of HRA’s charter members. This was not enough to satisfy the IJ, but what more could Onsongo do? An applicant should not be penalized for failing to procure evidence that simply is not available. Accord Bellido v. Ashcroft, 367 F.3d 840, 844 (8th Cir.2004) (noting that it is often difficult to obtain documents from an asylum applicant’s home country, but this “should never serve to close the door on a grant of asylum”).
In my view, the majority misses the mark in nitpicking the nuances of her political affiliation.[8] She is not required to show with excruciatingly specific detail the relationship between Kenya’s national and local opposition parties and groups. Rather, it is only necessary that Onsongo show that her affiliation with those groups or their beliefs subjected her to persecution. See 8 U.S.C. §§ 1101(a)(42)(A) (defining “refugee” as a person who cannot return to their home country due to persecution “on account of ... membership in a particular social group, or political opinion”), 1158(b)(1)(A) (stating a refugee is eligible for asylum). She obviously met this test. When asked at her hearing whether persecuting governmental authorities would know her as a member of HRA or DP, she stated essentially that it did not matter, because it was her affiliation with any type of opposition group that led to her maltreatment. (See Admin. Rec. at 200 (“They used to differentiate us by the fact that we were against the government.”).) Our asylum laws are intended to protect aliens against precisely this type of persecution, and I believe they ought to in this case. Thus, I would grant the petition.[9]

. Nor does the Administrative Record reflect the level of decorum that one would expect from an official proceeding before an agency of the United States government. First, On-songo was not provided a Swahili interpreter at her initial interview with the INS or at her first hearing before an IJ. Although she received interpretative assistance at her subsequent hearings, other irregularities infected the hearings. During one hearing, the IJ ordered Onsongo to remove the contents of her purse and surrender envelopes and documents contained therein to the IJ to be used as evidence in this case. Meanwhile, the lawyer for the government questioned Onsongo as to whether she was really the mother of the children listed in her asylum application, a question whose motivation is not apparent in the record. The same lawyer expressed disbelief when Onsongo could not calculate the correct exchange rate for Kenyan currency to United States dollars.

. The majority suggests that the IJ’s credibility determination is supported not only by the confusion over Onsongo’s party membership, but also by the entirety of the Administrative Record. I disagree. Having reviewed that record, it details a compelling tale of Onsongo twice being arrested and held in jail, being raped by two police officials, and losing her business to arson, all because of her political affiliation. Rather than develop the record with regard to these instances of persecution, the IJ instead focused on but one thing: the name of Onsongo’s political group.

. The IJ found that Onsongo was not at risk of future persecution because the party with which she was affiliated was now in power. As the majority notes, this issue is not properly before us because it was not a basis of the BIA’s affirming decision.