# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2351

_____

Alexander V. Litvinov, Alena     *
Litvinava,     *
    *
        Petitioners,     *
    *  Petition for Review from the
      v.     *  Board of Immigration Appeals.
    *
Eric H. Holder, Jr., Attorney General     *
of the United States,     *
    *
        Respondent.     *

_____

Submitted: February 10, 2010
Filed: May 20, 2010

_____

Before RILEY,[1] Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Alexander Litvinov and his wife, Alena Litvinava (together "the Litvinovs"), both citizens of Belarus, petition for review of a decision of the Board of Immigration Appeals (BIA), affirming the immigration judge's (IJ's) denial of their application for asylum and withholding of removal. For the following reasons, we deny the petition.

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

# I.

## A. Procedural Background

On April 24, 2000, Mr. Litvinov entered the United States on a nonimmigrant temporary work visa with permission to remain in the United States until December 3, 2004. Mrs. Litvinava followed her husband to the United States on September 13, 2000, on a nonimmigrant temporary traveler's visa. On May 25, 2004, Mr. Litvinov filed an application with the United States Citizenship and Immigration Services for asylum under section 208 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1158.[2] The application included Mrs. Litvinava as a derivative applicant. The application alleged past persecution and a well-founded fear of future persecution due to the Litvinovs' political opinions and membership in a particular social group. In his affidavit in support of the asylum application, Mr. Litvinov claimed that "[Belarus] is a dictatorship, and it has gotten even worse during the time [we have] been in the United States." (J.A. 425.)

On March 16, 2005, the Department of Homeland Security (DHS) commenced removal proceedings against the Litvinovs through Notices to Appear in Immigration Court and charged them as removable pursuant to section 237(a)(1)(B) of the INA, 8 U.S.C. § 1227(a)(1)(B), as aliens who remained in the United States longer than authorized. The Litvinovs conceded removability but (1) renewed their requests for political asylum, (2) requested withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), and (3) requested relief under Article III of the Convention Against Torture (CAT). In the alternative, the Litvinovs requested voluntary departure pursuant to 8 U.S.C. § 1229c.

---

[2]Because the application was filed prior to May 11, 2005, the burden of proof standard under the REAL ID Act of 2005, 8 U.S.C. § 1158(b)(1)(B), does not apply. See In re S-B-, 24 I & N Dec. 42, 42-45 (BIA 2006).

After a merits hearing on June 28, 2006, the IJ denied the Litvinovs' claims for political asylum, withholding of removal, and CAT relief. The IJ found the Litvinovs credible in most of their testimony but determined that some portions of the testimony were inconsistent. The IJ concluded that "[t]he Respondents failed to carry their burden of proving that they suffered or will suffer mistreatment that amounts to persecution . . . under the [INA]." (J.A. 53.) The IJ granted the Litvinovs' request for voluntary departure.

On October 10, 2006, the Litvinovs appealed the decision of the IJ to the BIA. The Litvinovs conceded that they had not suffered past persecution and only argued that they had a well-founded fear of future persecution. The Litvinovs did not appeal the denial of CAT relief.[3] On May 12, 2009, the BIA issued a decision adopting and affirming the IJ's determination and dismissing the appeal. The BIA concluded that "even assuming credibility," the Litvinovs had not presented "specific, direct, and objective evidence" to establish a well-founded fear of persecution. (Id. at 4.) Furthermore, the BIA stated that "[the Litvinovs'] fear of persecution on account of actual or imputed political opinion is speculative and not adequate to establish a claim." (Id.) The BIA also found that, because the Litvinovs had failed to demonstrate their entitlement to asylum, they had failed to satisfy the higher standard for withholding of removal.

## B. Factual Background

From affidavits attached to the asylum application and testimony during the merits hearing, we gather that the facts underlying the Litvinovs' petition began with the 1994 Belarus election, when Alexander Lukashenko became President of Belarus. Lukashenko remains the President and since his election, numerous reports from the

---

[3]Because the Litvinovs do not raise the CAT claim on appeal, it has been abandoned. See Uli v. Mukasey, 533 F.3d 950, 954 n.2 (8th Cir. 2008).

-3-

U.S. State Department have discussed the deteriorating human rights record in Belarus, especially regarding mistreatment of people who do not support the government. These reports reflect that Belarusian citizens are forced to support the government and accept Lukashenko's ideologies.

The Litvinovs have never supported Lukashenko. In fact, during Lukashenko's election, Mrs. Litvinava was a member of the local election committee, and she objected to the management of the election. Mrs. Litvinava alleged that Lukashenko was elected through the use of fabricated ballots and fraudulent voting. Mrs. Litvinava claims that, based on her objections, she was forced to perform additional work duties for no pay and required to complete tasks outside the scope of her employment. However, this claim was not reflected in the asylum application. Mrs. Litvinava, an artist, also claims that, when Lukashenko became President, she was never allowed to display her art because her work contained political messages. Mr. Litvinov alleges that he and his daughter, Viktorya, were targeted and mocked for having Jewish friends in Belarus, and that Viktorya's teacher referred to her as a "stinking Jew," although Viktorya did not mention this during her testimony at the merits hearing.[4]

In her affidavit, Viktorya stated that, when she was a high school student, she became a member of the Malady Front—a youth organization promoting the traditions of Belarus. Under Lukashenko, the Belarusian government prohibited the Malady Front, viewing it as an opposition organization. When Viktorya was 17 years old,

_____

[4]Viktorya filed a separate application for asylum, withholding of removal, and relief under CAT. Her case was also referred to the IJ and was consolidated with her parents' application. Although Viktorya's application was also denied by the IJ, her case was remanded to the Immigration Court by the BIA in light of her marriage to a United States citizen. Although her case is not at issue here, the Litvinovs base some of their arguments on Viktorya's active participation in a Belarusian political group.

-4-

Belarusian police arrested her and other members of the Malady Front at a meeting. Because she was under 18 years of age, Viktorya was released and was excused from paying a fine. Viktorya also worked as a writer for the local newspaper where she composed an article about a Valentine's Day parade where people wore red and white headbands. Red and white were the colors of the Belarus national flag which had been prohibited by Lukashenko. Viktorya was eventually fired from the newspaper because her Valentine's Day article, and several of her other articles were viewed as opposing the government.

As an active member of the Malady Front, Viktorya participated in, and helped organize, numerous protests. Viktorya stated that, when her high school principal learned of her involvement with the Malady Front, Viktorya was "forced to transfer" to another school. Although her parents filed several complaints regarding Viktorya's treatment at school, they received no support from educational administrators in the government.

After her parents moved to the United States, Viktorya remained in Belarus to attend college, visiting her parents during the summers. At the university Viktorya attended, the students' activities were closely monitored, and the students were pressured to vote in favor of Lukashenko. In 2001, Viktorya was denied her scholarship to the university for no "official" reason. When Viktorya objected, she began receiving "B's" in school, although she had historically been a straight "A" student. The Litvinovs allege that Viktorya's low grades and other unfair treatment at the university were based on disclosures to her teachers that her parents lived in the United States.

The Litvinovs' son, Maksim,[5] came to the United States on a temporary visa like his parents. Maksim returned to Belarus in 2003 to register for the draft. The

---

[5]Maksim was originally involved in this case but was granted adjustment of status after his marriage to a United States citizen. Removal proceedings against him have been terminated.

Litvinovs allege that, when Maksim was being examined for the draft, the examiner discovered that Maksim had been living in the United States, and the examiner insulted Maksim and threw him out of the room without his clothes.

The Litvinovs also claim that their friends and relatives in Belarus have been difficult to contact. They allege that, when they can reach their friends and relatives on the telephone, they do not discuss politics for fear that they are being monitored by the government. Several letters between the Litvinovs and their friends and family in Belarus have either never been delivered or have been delivered opened. The Litvinovs allege that family and friends have alerted them that authorities have been inquiring as to the Litvinovs' whereabouts, and that several people have warned the Litvinovs that they should not return to Belarus. After disclosing that the Litvinovs lived in the United States, Mrs. Litvinov's sister, who lives in Belarus, was asked to leave her job without any explanation. Furthermore, the Litvinovs claim that Belarus recently passed a law that criminalizes expressions of government opposition. However, the Litvinovs have not produced any specific evidence of anyone arrested under such law.

## II.

In the Litvinovs' petition for review, they argue that the IJ (1) applied an "inappropriately high" legal standard to their asylum claim, and (2) failed to consider relevant evidence and testimony at the merits hearing. The Litvinovs also argue that the BIA erred in affirming the IJ's decision. "We generally review the BIA's decision as the final agency action, but where the BIA essentially adopted the IJ's opinion while adding some of its own reasoning, we review both decisions." Alanwoko v. Mukasey, April 21, 2010, 912 (8th Cir. 2008) (quotation omitted).

## A. Legal Standard

The Litvinovs first argue that the IJ applied an "inappropriately high" legal standard to their asylum claim. "We review questions of immigration law de novo." Malonga v. Mukasey, 546 F.3d 546, 550 (8th Cir. 2008). Under the INA, the Attorney General may grant asylum to any alien who qualifies as a "refugee." 8 U.S.C. § 1158(b)(1). A refugee is:

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). Persecution has been defined by this court as "the infliction or threat of death, torture, or injury to one's person or freedom, on account of race, religion, nationality, membership in a particular social group, or political opinion." Davila-Mejia v. Mukasey, 531 F.3d 624, 628 (8th Cir. 2008) (quotation omitted). It "is an extreme concept and does not include low-level intimidation and harassment." Zakhirov v. Ashcroft, 384 F.3d 541, 546 (8th Cir. 2004).

The Litvinovs do not appeal the IJ's finding that they had not experienced past persecution and only contest the finding that they did not establish a well-founded fear of persecution. To establish a well-founded fear of persecution, "an alien need not prove that it is more likely than not that he or she will be persecuted in his or her home country." INS v. Cardoza-Fonseca, 480 U.S. 421, 440, 449 (1987) (stating that "there is simply no room in the United Nations' definition for concluding that because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, that he or she has no 'well-founded fear' of the event happening."). However, "[i]f an applicant attempts to establish a well-founded fear of future persecution without having shown past persecution then an alien must show the fear is both subjectively

genuine and objectively reasonable." Uli v. Mukasey, 533 F.3d 950, 955 (8th Cir. 2008) (quotation omitted). "Subjectively, the alien must demonstrate with credible evidence that he genuinely fears persecution." Feleke v. INS, 118 F.3d 594, 598 (8th Cir. 1997). Objectively, "an alien must present credible, direct, and specific evidence of facts that show a reasonable person in the alien's position would fear persecution if returned to the alien's native country." Loulou v. Ashcroft, 354 F.3d 706, 709 (8th Cir. 2003) (quotation omitted). This can be demonstrated by establishing that "there is a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership of a particular social group, or political opinion . . . ." 8 C.F.R. § 208.13(b)(2)(iii)(A).

The Litvinovs argue that the IJ misapplied the law and applied an "inappropriately high standard" to their asylum claim by requiring them to show that specific events would occur upon their return to Belarus. The Litvinovs base this contention on one statement in the IJ's decision where the IJ expresses that the Litvinovs (1) "did not offer any evidence supporting their claim that they will be immediately imprisoned and disappear for having violated a newly enacted law outlawing government opposition," and (2) "failed to present any substantive proof that the government will charge them with violating this law . . . for simply having spent too much time in the United States." (J.A. 52.)

However, when the IJ's decision is read in its entirety, it is clear that the IJ applied the correct legal standard for an asylum claim. The IJ's conclusion accurately reflects that "[t]he [Litvinovs] failed to carry their burden of proving that they suffered or will suffer mistreatment that amounts to persecution . . . under the [INA]." (J.A. 53.) The IJ further provides a thorough explanation of the asylum standard before concluding that the Litvinovs did not meet this standard. In the IJ's statement, which is disputed by the Litvinovs, it is clear that the IJ was simply emphasizing the Litvinovs' lack of evidence to support their claim, not applying an impermissibly high

standard. Therefore, when read in its entirety, we conclude that the IJ decision states the accurate legal standard for asylum.

## B. Evidence

The Litvinovs next argue that the IJ erred by failing to properly consider evidence regarding deteriorating human rights conditions in Belarus. The Litvinovs' argument, however, is unavailing. "We review the administrative findings of fact, including credibility determinations, under a substantial evidence standard." Manani v. Filip, 552 F.3d 894, 901 (8th Cir. 2009). The IJ's decision will be upheld unless the evidence "'was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution.'" Nyama v. Ashcroft, 357 F.3d 812, 816 (8th Cir. 2004) (quoting INS v. Elias-Zacaruas, 502 U.S. 478, 483-84 (1992)).

The Litvinovs argue that the IJ did not consider the changes that have occurred in Belarus' political environment since they left in 2000. The Litvinovs further allege that IJ failed to consider the fact that, based on Lukashenko's growing control, the Belarusian government has an increasing distrust for the United States. The Litvinovs claim that based on this evidence, they are now likely to be subjected to persecution for Viktorya's previous political activities with the Malady Front, and for their time spent living in the United States.

It is well established that evidence of persecution that is "insufficiently specific or imminent" does not establish persecution for an asylum claim. Ladyha v. Holder, 588 F.3d 574, 578 (8th Cir. 2009). The Litvinovs only presented generalized and speculative statements of fear regarding what may occur upon their return to Belarus, primarily based on events from their past. They presented only generalized testimony regarding the Belarusian government's alleged interest in their location and various human rights reports regarding Belarus. In fact, the only direct evidence the Litvinovs introduced concerned Viktorya's poor treatment at school, Maxim's mistreatment when he registered for the draft, and members of their family whose employment had

been terminated. These instances—lower academic scores, mockery, and fewer employment opportunities—absent physical injury, do not rise to the level of persecution in asylum claims. See Quomsieh v. Gonzales, 479 F.3d 602, 606 (8th Cir. 2007) ("Absent physical harm, [] incidents of harassment [and] unfulfilled threats of injury . . . are not persecution."); see also Nyonzele v. INS, 83 F.3d 975, 983 (8th Cir. 1996) ("Fears of economic hardship or a lack of educational opportunities, however, do not establish a well-founded fear of persecution").

Although the Litvinovs reference a new law in Belarus, passed "in October or November of 2005," which criminalized any opposition to the Lukashenko regime, the Litvinovs did not present any evidence of this law or identify it by citation, nor did they identify anyone that has been punished under such law. Furthermore, they make no reference to any physical harm they have suffered or will likely suffer in the future. At most, all that the Litvinovs have presented is generalized, subjective evidence that they genuinely fear persecution upon their return to Belarus. This evidence, however, fails to satisfy the objective requirement for an asylum claim.

The Litvinovs also argue that the IJ erred by finding witness testimony to lack credibility in certain respects. An IJ must "identify a basis in the record for disbelieving a witness's critical testimony." Singh, 495 F.3d at 557. "This court defers to an immigration judge's credibility finding where the finding is supported by a specific, cogent reason for disbelief." Sow v. Mukasey, 546 F.3d 953, 956 (8th Cir. 2008) (quotation omitted). In In re A-S-, 21 I. & N. Dec. 1106 (BIA 1998), the BIA affirmed the IJ's decision that an asylum applicant's testimony was not credible based on failure to provide a "convincing explanation" for multiple inconsistences, stating:

> [W]hile omissions of facts in an asylum application or during testimony might not, in themselves, support an adverse credibility determination, in this case the omission of key events is coupled with numerous inconsistencies, and it is therefore another specific and cogent reason supporting the Immigration Judge's adverse credibility finding.

Id. at 1009-10.

Here, the IJ noted that some of the testimony provided by the Litvinovs did not match the information presented in their asylum application and testimony of other witnesses. The IJ identified several such "inconsistences and omissions" in the testimony stating:

> The Respondent testified that his daughter was expelled from high school. However, his daughter testified that she voluntarily left high school. Further, his written statement indicates that one of his daughter's teachers called her a "stinking Jew" and gave her lower grades because she had dark hair, dark eyes, and she had Jewish friends. However, his daughter never recounted this experience. In addition, he testified that local militia beat Malady Front members at the meeting where his daughter was arrested. However, his daughter never indicated that the militia beat meeting participants. Although his written statement indicates that the government arrested him twice, he failed to mention these incidents in his testimony. The Respondents' testimony regarding Mrs. Litvinava's participation in the school election committee, which allegedly gave rise to many problems she experienced, is noticeably absent from the Respondent's written statement. These inconsistencies and omissions cast doubt on these aspects of the Respondents' testimony, and the Court finds them less than credible regarding these events.

(J.A. 52.) The Litvinovs provide unpersuasive justifications to account for these discrepancies, in particular explaining that: (1) because it was Mr. Litvinov's asylum application, they failed to document all of the evidence regarding any mistreatment of Mrs. Litvinov; and (2) varying language interpretations can be used to explain the discrepancies. These explanations are unconvincing. Because (1) the discrepancies and omissions were actually present; (2) these discrepancies and omissions provide "specific and cogent" reasons to conclude that the Litvinovs provided incredible testimony that went to the heart of their claims; and (3) the Litvinovs have not provided a convincing explanation for the discrepancies and omissions, see In re A-S,

-11-

21 I. & N. Dec. at 1109-10, we conclude that the IJ did not err in its credibility determination.[6]

Even if we were to conclude that the IJ erred in failing to fully consider the evidence of recent events in Belarus, and, as stated by the BIA, "even assuming credibility" of all the witnesses, a reasonable fact finder would not be compelled to find that the Litvinovs have a well-founded fear of persecution based on the evidence presented at the hearing. See Nyama, 357 F.3d at 816. Therefore, the BIA's and the IJ's denial of the Litvinovs' asylum application was appropriate.

Furthermore, because the standard an applicant must show for withholding of removal is higher than that for asylum, see Malonga, 546 F.3d at 551 ("The clear probability standard for withholding of removal is more onerous than the well-founded fear standard for asylum."), we conclude that the IJ and BIA did not err in denying the Litvinovs' application for withholding of removal.

III.

For the reasons stated above, we deny the petition for review.

_____

---

[6]We note that lack of credibility was not the sole basis for the IJ's denial of the application, and that the IJ found some of the testimony to be credible.