# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1123
_____

Moudjahed Ferchichi; A. F.; Salima Ferchichi; T. F.

*Petitioner*s

v.

Pamela Bondi,[1] Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: October 24, 2024
Filed: February 14, 2025

_____

Before LOKEN, SMITH, and GRASZ, Circuit Judges.

_____

SMITH, Circuit Judge.

Salima and Moudjahed Ferchichi, along with their children T.F. and A.F. (collectively, "Ferchichis"), seek review of the Board of Immigration Appeals's

---

[1]Attorney General Bondi is automatically substituted for her predecessor under Federal Rule of Appellate Procedure 43(c)(2).

(Board) dismissal of their appeal from the immigration judge's (IJ) order of final removal against them. We deny the petition.

## I. *Background*

The Ferchichis are natives and citizens of Algeria. At birth, T.F. was diagnosed with a severe form of spina bifida.[2] His parents, Salima and Moudjahed, were told by the doctors at the hospital that T.F. had a fatal birth defect. The doctors removed T.F. from his mother, Salima, to an unknown location. Concerned, Salima searched the hospital for T.F. and found him in an abandoned ward wrapped in a sheet on a countertop.

After the hospital discharged T.F., they referred the Ferchichis to a neurosurgeon. The neurosurgeon diagnosed T.F. with spina bifida, but consistent with the hospital's prognosis, offered no course of treatment or medication. While waiting for their next scheduled appointment, Salima and Moudjahed researched T.F.'s condition and discovered that survival typically requires that infants receive immediate surgery. At their next appointment, they requested surgery, but the neurosurgeon refused. The neurosurgeon told Salima and Moudjahed that surgery was not necessary because the spinal column would "heal on its own and . . . he would grow out of the condition." A.R. at 471.

As T.F.'s condition worsened, the Ferchichis sought a second opinion from Dr. Sidi Said, the President of the Algerian Neurosurgery Society. Dr. Said recommended that T.F. have surgery abroad. Dr. Said commented that "having the surgery in Algeria would leave [T.F.] at a higher risk of complications because Algerian doctors are less experienced in performing such complex surgeries." *Id*. Dr. Said agreed to apply to the Ministry of Health for the necessary approval for obtaining surgery abroad. However, when the Ferchichis returned three months later,

---

[2]"[S]pina bifida . . . is a developmental birth defect that occurs when the incomplete closure of the embryonic neural tube results in an incompletely formed spinal cord." A.R. 468–69. Consequently, the "vertebrae overlying the open portion of the spinal cord do not fully form and remain unfused and open." *Id.* at 469.

Dr. Said revoked his offer to apply for surgery abroad and maintained that "Algerian hospitals ha[d] the equipment and expertise necessary to perform the surgery successfully." *Id*. at 472. The Ferchichis suspected that this unexplained change in position was likely due to "pressure from the Ministry of Health, or because he felt he would lose credibility as a neurosurgeon if he admitted that Algerian doctors [were] incapable of treating a disease that [could] be treated successfully in other countries." *Id.* at 471–72. Thereafter, Dr. Said claimed that he was unable to schedule surgery because the hospital's surgery schedule was full.

The Ferchichis sought nonmedical assistance through a meeting with the sister of the Algerian president. The president's sister was sympathetic to T.F.'s situation and recommended a doctor who could sign the form needed for treatment abroad. However, the recommended doctor refused to sign the form and claimed "that he would lose his job if he did because authorizing the treatment was contrary to Algeria's policy of treating spina bifida domestically." *Id.* at 473. The Ferchichis explained in their affidavit that "[b]ecause the Algerian health care system requires the government to pay for costs of treatment, whether performed in Algeria or abroad, the Ministry of Health often refuses to send citizens abroad for expensive treatments." *Id*. Despite numerous attempts, the Ferchichis did not find a doctor who would sign the form authorizing treatment abroad.

Unable to obtain authorization, the Ferchichis began raising funds to self-pay for the international surgery. After receiving exposure through a YouTube video, a regional radio station, and newspaper articles, the Ferchichis raised $130,000. In connection with their fundraising efforts, Dr. Azzedine Stambouli from the Algerian Association of Greater Washington located in Minnesota contacted Salima and Moudjahed. Dr. Stambouli entered T.F.'s name into a lottery at the Mayo Clinic to receive free treatment for his condition in Rochester, Minnesota. T.F.'s name was entered and drawn. The Ferchichi family used their donated funds for transportation expenses to the United States.

While awaiting his surgery abroad, T.F.'s spinal sac became extremely swollen, and the Ferchichis sought emergency surgery in Algeria. The Ferchichis were referred to another doctor in Algiers, Algeria, to conduct the surgery. Although willing to conduct the surgery, the doctor postponed it so he could bring in other doctors to make a case study out of T.F.'s rare case of spina bifida.

One week later, the sac on T.F.'s back broke, and his spinal column was left fully exposed. Salima and Moudjahed attempted to receive emergency medical treatment for T.F. from several private clinics, but the clinics lacked "the equipment or expertise necessary to treat him." *Id.* at 474. Salima and Moudjahed then took T.F. to the largest hospital in Algeria. The neurologist at the hospital, Dr. Houria Benkhalas, confirmed that T.F. had contracted several severe infections. After Salima's continual pleading, Dr. Benkhalas finally sutured T.F.'s open wound. Dr. Benkhalas also prescribed several medications. Those medications proved ineffective at best and potentially deadly to T.F.

After undergoing emergency brain surgery to treat his infections, T.F. stopped breathing. Although he was eventually intubated, he remained in a coma for a week. During this time, Dr. Stambouli scheduled T.F.'s treatment with the Mayo Clinic in Minnesota and arranged his medical air transport from Algeria. Dr. Benkhalas, on the other hand, initially resisted discharging T.F. from the hospital and releasing his medical records. She believed that T.F. simply needed to "return home to recover." *Id.* at 476. Eventually, Dr. Benkhalas released the medical records. On May 15, 2008, Salima and T.F. traveled to the Mayo Clinic with no interference from the Algerian government. After receiving several surgeries in the United States and continued medical treatment for his various infections, T.F.'s condition improved and stabilized.

Moudjahed took a one-month absence from his job at the Ministry of Religious Affairs to come join Salima in the United States. He stayed in the United States beyond his authorized leave and was subsequently terminated by the Ministry

of Religious Affairs. Moudjahed brought two of their sons, N.F. and A.F., and left their two oldest sons in Algeria to continue their studies.

The Ferchichis entered the United States as BS-vistor visa holders on May 15, 2008, and November 24, 2008. Salima and T.F. had authorization to stay in the United States until November 24, 2008, and Moudjahed, A.F., and N.F. had authorization to stay until January 24, 2009. The Ferchichis filed an application for asylum and for withholding of removal in 2009 based on "their status as parents of a person born with spina bifida."[3] *Id.* at 441.

DHS commenced removal proceedings on November 9, 2009. The Ferchichis conceded the charge of removability. However, the Ferchichis sought asylum, withholding of removal, and protection under the Convention Against Torture (CAT). The Ferchichis sought asylum for (1) past persecution based on T.F.'s disability and (2) a well-founded fear of future persecution from the Algerian government because of their publicization of the Algerian medical communities' failures. Salima and Moudjahed submitted affidavits and presented testimony in support of their claims.

On July 12, 2011, the IJ denied the Ferchichis' claims for asylum, withholding of removal, and protection under CAT. The IJ found Salima's and Moudjahed's testimony generally credible. The IJ concluded, however, that no past persecution occurred because the failure to treat T.F. resulted from Algeria's inability to provide care and did not constitute persecution based on T.F.'s condition. The IJ determined that a broad government policy to avoid the costs of international treatment rather than targeted persecution of persons with spina bifida was the reason behind the denial of treatment. The IJ rejected the alternative explanation that it was the Algerian government's policy to persecute people born with spina bifida and noted that the Algerian president's sister's sympathetic assistance to T.F. receiving

---

[3]T.F. sought asylum and withholding of removal based on "his status as a person born with a birth defect, and specifically as a person born with spina bifida." *Id.* at 441.

treatment counteracted the Ferchichis' argument. Additionally, there was no evidence that the government retaliated against the Algerian president's sister for recommending treatment. Finally, the IJ noted that the government did not prevent the family from leaving the country to seek medical attention at their own expense.

Next, the IJ turned to the Ferchichis' claim of future persecution. The IJ rejected the Ferchichis' argument that they feared future persecution because of their imputed public opinion. The Ferchichis claimed that they feared government persecution because they openly criticized the government and shed light on Algeria's lack of medical expertise to treat spina bifida. The Ferchichis testified that they left two sons in Algeria when seeking treatment for T.F. They noted that, on several occasions, police officers in plain clothes visited their house asking about the Ferchichis' whereabouts. The IJ noted that the sons had not been verbally threatened or physically harmed. The sons continued to live in Algeria without suffering any harm. The IJ characterized these encounters as a "country's right to question where its citizens have gone when they disappear without notice." *Id.* at 162. The IJ found that Moudjahed's work as a security guard in Algeria's Ministry of Religious Affairs bolstered this argument because he had exceeded his one-month authorized absence without telling his employer. Lastly, the IJ rejected the argument that Moudjahed's potential struggle to find a new job upon return to Algeria would rise to the level of future persecution. Having failed to meet their burden of proof with respect to the asylum claim, the IJ found that they necessarily failed to meet the burden required for withholding of removal and their CAT claims. Accordingly, the IJ denied asylum.

The Ferchichis appealed the IJ's denial of asylum and withholding of removal to the Board on August 30, 2011.[4] The Ferchichis case was administratively closed on May 8, 2013. On April 22, 2022, the Department of Homeland Security (DHS) moved to reinstate the proceedings. On November 10, 2022, the Ferchichis filed a

---

[4]The Ferchichis did not raise any challenge to the denial of their claim for protection under CAT.

motion to remand to the IJ because of changed circumstances.[5] On December 22, 2022, the Board affirmed the IJ's denial of their claims for relief and protection from removal and denied the motion to remand.

First, the Board agreed with the IJ that sufficient record evidence supported that the Algerian medical communities' refusal to treat T.F. stemmed from the inexperience of Algerian doctors and the government's desire to avoid international treatment costs. On appeal, the Ferchichis argued that the IJ ignored evidence showing that the Algerian government had persecutory motives. The Board acknowledged that mixed motives can underlay treatment. Nevertheless, the Board reasoned that an IJ is not required to view evidence in a light favorable to the Ferchichis when there are two permissible views of the evidence. Accordingly, the Board found that the IJ did not clearly err by choosing to make a reasonable inference from the evidence presented that the failure to treat T.F. arose from motives unrelated to persecution.

Second, the Board affirmed the IJ's determination that the Ferchichis had not established a well-founded fear of future persecution. The Board reiterated many of the IJ's findings. It emphasized that the record lacked direct and specific evidence demonstrating that a reasonable person would fear future persecution. The Board pointed to the IJ's findings that the Ferchichis' family members who remained in Algeria were not physically harmed or verbally threatened. Moreover, despite Algerian media exposure while the Ferchichi family remained in Algeria, they faced no persecution during their time there. The Board found the evidence of general country conditions including kidnapping, disappearances, and torture in Algeria

---

[5]The only change provided by the Ferchichis was that a visa petition filed on N.F.'s behalf by his United States citizen spouse was pending. Otherwise, they did not proffer any evidence that would suggest the outcome of their case would be different based on the passage of time. Therefore, the Board denied the motion to remand. On appeal, this court granted a motion to dismiss N.F. as a party to this appeal pursuant to submissions that N.F.'s visa petition had been approved. Accordingly, N.F. was removed as a party to this petition.

unpersuasive. The Board found that the evidence presented was mere speculation and insufficient to support a likelihood of future persecution. Therefore, the Board affirmed the IJ's decision. The Ferchichis petitioned this court for review.

## II. *Discussion*

"[W]e review 'decisions on asylum, withholding of removal, and CAT protection under the substantial evidence standard, upholding the decision if it is supported by reasonable, substantial, and probative evidence based on the record as a whole.'" *Calvo-Tino v. Garland*, 107 F.4th 861, 865 (8th Cir. 2024) (alteration in original) (quoting *Lemus-Arita v. Sessions*, 854 F.3d 476, 480 (8th Cir. 2017)). Factual determinations, including the question of past persecution or well-founded fear of future persecution, are reviewed under the substantial evidence standard. *He v. Garland*, 24 F.4th 1220, 1224 (8th Cir. 2022). Under the substantial evidence standard, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Tojin-Tu v. Garland*, 33 F.4th 1020, 1023 (8th Cir. 2022) (quoting 8 U.S.C. § 1252(b)(4)(B)). "Only the [Board's] order is subject to our review, including the IJ's findings and reasoning to the extent they were expressly adopted by the [Board]." *Pacheco-Mota v. Garland*, 84 F.4th 762, 765 (8th Cir. 2023) (quoting *Silvestre-Giron v. Barr*, 949 F.3d 1114, 1117 (8th Cir. 2020)).

To qualify for asylum, a petitioner must establish either past persecution or a well-founded fear of future persecution on account of their race, religion, nationality, political opinion, or membership in a particular social group. *See* 8 U.S.C. §§ 1101(a)(42); 1158(b)(1)(B)(i). Persecution may stem from a mixed motive, and a finding of a particular motive does not "preclude a finding of additional motives that may concern a protected ground." *Marroquin-Ochoma v. Holder*, 574 F.3d 574, 577 (8th Cir. 2009) (citing *De Brenner v. Ashcroft*, 388 F.3d 629, 637 (8th Cir. 2004)). However, the petitioners must show that a protected ground "was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). "Under the one central reason nexus standard, a protected ground need not be the sole reason for persecution, but the protected ground cannot be

incidental or tangential to the persecutor's motivation." *Garcia-Moctezuma v. Sessions*, 879 F.3d 863, 868 (8th Cir. 2018) (internal quotations omitted).

## A. *Past Persecution*

The Ferchichis argue that the IJ and the Board failed to properly consider the Algerian government's persecutory motive toward persons with spina bifida as the central reason for refusal to treat T.F.

Our circuit has held that an "absence of [a] nexus between the conditions and a persecutory motive" negates a finding of inadequate medical care as persecution. *Perez-Rodriguez v. Barr*, 951 F.3d 972, 975 (8th Cir. 2020) (holding that inadequate mental institutions were not persecutory toward persons with schizophrenia when all individuals entering the institution faced the same conditions); *Ixtlilco-Morales v. Keisler*, 507 F.3d 651, 655–56 (8th Cir. 2007) (holding that inadequacies in Mexico's healthcare for treating HIV positive individuals was not an attempt to persecute those with HIV); *see also Ramage v. Barr*, 793 F. App'x 38, 40 (2nd Cir. 2019) (unpublished summary order) (holding that although medical care was more limited generally, the petitioners failed to show specific examples of persons similarly situated to petitioners who were deprived of or denied medical care).

The Ferchichis argue that, unlike the cases cited above, they submitted sufficient record evidence to demonstrate a nexus between the inadequate medical care and the Algerian government's persecutory motive. In particular, the Ferchichis submitted several Algerian news articles highlighting the difficulties that other Algerian families experienced in receiving treatment for their children with spina bifida. Although the articles acknowledged the parents' difficulty in receiving treatment for spina bifida, they also stated that the treatment is "impossible in Algeria because of the limited expertise" in the field. A.R. 717. Therefore, the statements in these articles only reinforce the IJ's findings that the Algerian medical community lacked the expertise and resources to effectively treat spina bifida. Moreover, the surrounding evidence in the record illustrated that Algerians generally have difficulty obtaining medical care in Algeria, not just those with spina bifida.

As Moudjahed highlighted in his affidavit, the Ferchichis struggled to find a hospital that would deliver T.F. because "[i]t is difficult to gain access to hospitals in Algeria because the public health system is under funded. Public hospitals are over-crowded and often require a political connection to gain admission." *Id.* at 469.

Substantial evidence supported the Board's conclusion that T.F.'s lack of care stemmed from the medical communities' lack of expertise and resources to treat spina bifida. As Moudjahed admitted in his affidavit, "[I]t is common for Algerian doctors to shy from treating severe cases of spina bifida, which pose risk of complications and require advanced technologies." *Id.* at 470. Notably, many doctors from whom the Ferchichis sought help did meet and discuss T.F.'s condition. Unfortunately, their medical advice was often uninformed, ineffective, or delayed.

Moreover, as admitted in Moudjahed's affidavit, "[T]he Algerian health care system requires the government to pay for costs of treatment, whether performed in Algeria or abroad, [and] the Ministry of Health often refuses to send citizens abroad for expensive treatments." *Id.* at 473. The Algerian government did not prevent T.F. from leaving Algeria to receive treatment. Instead, once T.F.'s family had the ability to pay for his treatment abroad, he was free to travel to the United States to do so.

On this record, no reasonable adjudicator would conclude Algeria's inadequate medical care for persons with spina bifida resulted from governmental persecution of such persons. Instead, the record overwhelmingly supports the Board's findings that the denial of care was linked to inadequacies in Algeria's health care system at large and the government's reluctance to pay for international treatment. Consequently, the Board had substantial evidence to conclude that the Ferchichis did not establish that they were subject to past persecution on account of T.F.'s status as a person with spina bifida.

### B. *Future Prosecution*

A fear of future persecution is deemed to be "well-founded" when it is both "subjectively genuine and objectively reasonable." *Feleke v. INS*, 118 F.3d 594, 598

(8th Cir. 1997). A fear is objectively reasonable if it has a "basis in reality" and is "neither irrational nor so speculative or general as to lack credibility." *Perinpanathan v. INS*, 310 F.3d 594, 598 (8th Cir. 2002). Moreover, petitioners "must demonstrate through credible, direct, and specific evidence that a reasonable person in [their] position would fear persecution." *Zheng v. Gonzales*, 415 F.3d 955, 960 (8th Cir. 2005) (internal quotation omitted).

"Persecution is an extreme concept that involves severe suffering or harm, such as the infliction or threat of death, torture, or injury to one's person or freedom, on account of a protected characteristic." *Calvo-Tino*, 107 F.4th at 865–66 (internal quotations omitted). "Absent physical harm, . . . incidents of harassment, unfulfilled threats of injury, and economic deprivation are not persecution." *Quomsieh v. Gonzales*, 479 F.3d 602, 606 (8th Cir. 2007). We have rejected claims of persecution in cases "only involving cumulative social indignities, low-level harassment, or verbal insults." *Calvo-Tino*, 107 F.4th at 866. In *Litvinov v. Holder*, we held that "generalized testimony" about the "government's alleged interest in [petitioner's] location and various human rights reports regarding" the government were insufficient to rise to the level of persecution in asylum. 605 F.3d 548, 554 (8th Cir. 2010).

The Ferchichis argue that their actions in Algeria and open disagreement with the government's treatment of T.F.'s condition has created a fear of future persecution arising from an imputed political opinion. In support, the Ferchichis point to instances when plain-clothes Algerian police officers came by their residence in Algeria to question their family members about their whereabouts. They also highlight country condition reports that document how people who criticize the Algerian government are tortured, arrested, prosecuted for defamation, or otherwise disappear at the hands of the government.

On this record, the Board had substantial evidence to conclude that the visits by the Algerian government officials were not persecutory. The Ferchichis admitted that their sons and other family members were not verbally or physically threatened

and otherwise had not been subject to the speculative claims of torture, arrest, or disappearance. *See Tojin-Tiu*, 33 F.4th at 1024 ("That [the petitioner's] mother and sisters remained in Guatemala unharmed further undermines the claimed reasonableness of [the] fear."). Mere harassment that does not materialize into tangible threats or physical harm is generally insufficient for a showing of well-founded fear. *See Litvinov*, 605 F.3d at 554–55. The undisputed safe condition of all their family members since their departure, including their sons, undermines their claim of a well-founded fear of future persecution.

Likewise, the country condition reports would not cause a reasonable adjudicator to conclude contrary to the Board's finding that the Ferchichis did not have a well-founded fear of future persecution. The Ferchichis rely on precedent in which we found a country condition report to be direct and specific evidence to support a fear of persecution. *See Bellido v. Ashcroft*, 367 F.3d 840, 845 (8th Cir. 2004). However, in *Bellido*, we found that the State Department report documenting government abuses against labor union leaders was sufficiently direct evidence when the government had previously arrested the petitioner for being a union leader and participating in union activities. *Id*.

Here, no link exists between the country conditions reports and the Ferchichi family. The country condition reports concern suspicions that the government arrested, tortured, or otherwise caused the disappearance of persons suspected of terrorism against the government during the 1990s. Moreover, the Ferchichis fail to show that their criticism of the Algerian government's handling of T.F.'s treatment may subject them to Algerian defamation laws. Their experience while in Algeria makes this claim entirely speculative and otherwise doubtful. As the IJ and Board noted, T.F.'s case gained the most notoriety while the Ferchichis were in Algeria. Nonetheless, no member of the Ferchichi family was subjected to defamation laws, imprisonment, or torture by the Algerian government. Moreover, there was no evidence presented that the Algerian press who covered T.F.'s story or the Algerian president's sister incurred any penalty either. *See Kimumwe v. Gonzales*, 431 F.3d 319, 323 (8th Cir. 2005) (finding that petitioner did not have well-founded fear of

future persecution when the government did not threaten or abuse him during his time in the country). Accordingly, substantial evidence supported the Board's decision that the Ferchichis failed to show a well-founded fear of future persecution in Algeria.

## III. *Conclusion*

For the foregoing reasons, we deny the Ferchichis' petition.

_____